## GORIN v. UNITED STATES.*

No. 87. Argued December 19, 1940.—Decided January 13, 1941.

---

*Together with No. 88, *Salich* v. *United States,* also on certiorari, 310 U. S. 622, to the Circuit Court of Appeals for the Ninth Circuit.

20

*Mr. Donald R. Richberg,* with whom *Messrs. Seth W. Richardson, Isaac Pacht, Clore Warne,* and *Harry Graham Balter* were on the brief, for petitioners.

*Mr. Warner W. Gardner,* with whom *Solicitor General Biddle, Assistant Attorney General Rogge,* and *Mr. Louis B. Schwartz* were on the brief, for the United States.

MR. JUSTICE REED delivered the opinion of the Court.

This certiorari brings here a judgment of the Circuit Court of Appeals affirming the sentences of the two petitioners who were convicted of violation of the Espionage Act of June 15, 1917. 111 F. 2d 712. As the affirmance turned upon a determination of the scope of the Act and its constitutionality as construed, the petition

was allowed because of the questions, important in enforcing this criminal statute.

The joint indictment in three counts charged in the first count violation of § 1 (b) by allegations in the words of the statute of obtaining documents "connected with the national defense"; in the second count violation of § 2 (a) in delivering and inducing the delivery of these documents to the petitioner, Gorin, the agent of a foreign nation; and in the third count of § 4 by conspiracy to deliver them to a foreign government and its agent, just named. The pertinent statutory provisions appear below.[1] A third party, the wife of Gorin, was joined in

---

[1] Espionage Act of June 15, 1917, c. 30, 40 Stat. 217:

"Title I. Espionage. Section 1. That (a) whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation, goes upon, enters, flies over, or otherwise obtains information concerning any vessel, aircraft, work of defense, navy yard, naval station, submarine base, coaling station, fort, battery, torpedo station, dockyard, canal, railroad, arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, or other place connected with the national defense, . . . or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, or stored, . . .; or (b) whoever for the purpose aforesaid, and with like intent or reason to believe, copies, takes, makes, or obtains, or attempts, or induces or aids another to copy, take, make, or obtain, any sketch, photograph, photographic negative, blue print, plan, map, model, instrument, appliance, document, writing, or note of anything connected with the national defense; . . . shall be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or both.

"Sec. 2. (a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to, or aids or induces another to, communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecog-

and acquitted on all three counts. The petitioners were found guilty on each count and sentenced to various terms of imprisonment to run concurrently and fines of $10,000 each. The longest term of Gorin is six years and of Salich four years.

The proof indicated that Gorin, a citizen of the Union of Soviet Socialist Republics, acted as its agent in gathering information. He sought and obtained from Salich for substantial pay the contents of over fifty reports relating chiefly to Japanese activities in the United States. These reports were in the files of the Naval Intelligence branch office at San Pedro, California. Salich,

---

nized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by imprisonment for not more than twenty years: *Provided,* That whoever shall violate the provisions of subsection (a) of this section in time of war shall be punished by death or by imprisonment for not more than thirty years; and (b) whoever, in time of war, with intent that the same shall be communicated to the enemy, shall collect, record, publish, or communicate, or attempt to elicit any information with respect to the movement, numbers, description, condition, or disposition of any of the armed forces, ships, aircraft, or war materials of the United States, or with respect to the plans or conduct, or supposed plans or conduct of any naval or military operations, or with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense, which might be useful to the enemy, shall be punished by death or by imprisonment for not more than thirty years.

. . . . .

"Sec. 4. If two or more persons conspire to violate the provisions of sections two or three of this title, and one or more of such persons does any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be punished as in said sections provided in the case of the doing of the act the accomplishment of which is the object of such conspiracy. . . ."

a naturalized, Russian-born citizen, had free access to the records as he was a civilian investigator for that office. Speaking broadly the reports detailed the coming and going on the west coast of Japanese military and civil officials as well as private citizens whose actions were deemed of possible interest to the Intelligence Office. Some statements appear as to the movements of fishing boats, suspected of espionage and as to the taking of photographs of American war vessels.

Petitioners object to the convictions principally on the grounds (1) that the prohibitions of the act are limited to obtaining and delivering information concerning the specifically described places and things set out in the act, such as a vessel, aircraft, fort, signal station, code or signal book; and (2) that an interpretation which put within the statute the furnishing of any other information connected with or relating to the national defense than that concerning these specifically described places and things would make the act unconstitutional as violative of due process because of indefiniteness.

The philosophy behind the insistence that the prohibitions of §§ 1 (b) and 2 (a), upon which the indictment is based, are limited to the places and things which are specifically set out in § 1 (a) relies upon the traditional freedom of discussion of matters connected with national defense which is permitted in this country. It would require, urge petitioners, the clearest sort of declaration by the Congress to bring under the statute the obtaining and delivering to a foreign government for its advantage of reports generally published and available which deal with food production, the advances of civil aeronautics, reserves of raw materials or other similar matters not directly connected with and yet of the greatest importance to national defense. The possibility of such an interpretation of the terms "connected with" or "relating to" national defense is to be avoided by construing

the act so as "to make it a crime only to obtain information as to places and things specifically listed in section 1 as connected with or related to the national defense." Petitioners argue that the statute should not be construed so as to leave to a jury to determine whether an innocuous report on a crop yield is "connected" with the national defense.

Petitioners rely upon the legislative history to support this position.[2] The passage of the Espionage Act[3] during the World War year of 1917 attracted the close scrutiny of Congress and resulted in different bills in the two Houses which were reconciled only after a second conference report. Nothing more definite appears in this history as to the Congressional intention in regard to limiting the act's prohibitions upon which this indictment depends to the places and things in § 1 (a), than that a House definition of "national defense" which gave it a broad meaning was stricken out[4] and the conference report stated as to the final form of the present act: "Section 1 sets out the places connected with the national defense to which the prohibitions of the section apply." Neither change seems significant on this inquiry. The House bill had not specified the places under surveillance. The Conference change made them definite. The fact that the clause "or other place connected with the national defense" is also included in § 1 (a) is

---

[2] H. R. 291, 65th Cong., 1st Sess.; Conference Report No. 69, 55 Cong. Rec. 3301.

[3] Other titles such as neutrality, foreign commerce and at one time censorship, 55 Cong. Rec. 2097, 2102; 2109–2111; 2262; 2265; 3145; 3259; 3266, added to the difficulties.

[4] That definition read: "Section 1202. The term 'national defense' as used herein shall include any person, place, or thing in anywise having to do with the preparation for or the consideration or execution of any military or naval plans, expeditions, orders, supplies, or warfare for the advantage, defense, or security of the United States of America."

not an unusual manner of protecting enactments against inadvertent omissions. With this specific designation of prohibited places, the broad definition of § 1202 of the House was stricken as no longer apt and, as stated in Conference Report No. 69, § 6 of the act was therefore adopted. Obviously the purpose was to give flexibility to the designated places.[5] We see nothing in this legislative history to affect our conclusion which is drawn from the meaning of the entire act.[6]

An examination of the words of the statute satisfies us that the meaning of national defense in §§ 1 (b) and 2 (a) cannot be limited to the places and things specified in § 1 (a). Certainly there is no such express limitation in the later sections. Section 1 (a) lays down the test of purpose and intent and then defines the crime as going upon or otherwise obtaining information as to named things and places connected with the national defense. Section 1 (b) adopts the same purpose and intent of 1 (a) and then defines the crime as copying, taking or picturing certain articles such as models, appliances, documents, and so forth of anything connected with the national defense. None of the articles specified in 1 (b) are the same as the things specified in 1 (a). Apparently the draftsmen of the act first set out the places to be protected, and included in that connotation ships and planes, and then in 1 (b) covered much of the contents of such places in the nature of plans and documents. Section 2 (a), it will be observed, covers in much the same way the delivery of these movable articles or information to a foreign nation or its agent. If a govern-

---

[5] 55 Cong. Rec. 3306. Subsequent legislation relating to the protection of national defense information is not important. The act of January 12, 1938, 52 Stat. 3, is to protect against innocent disclosures. S. Rep. 108, 75th Cong., 2nd Sess.

Public No. 443, 76th Cong., 3d Sess., is merely an increase of penalties.

[6] Cf. *United States* v. *American Trucking Ass'ns,* 310 U. S. 534, 543.

ment model of a new weapon were obtained or delivered there seems to be little logic in making its transfer a crime only when it is connected in some undefined way with the places catalogued under 1 (a). It is our view that it is a crime to obtain or deliver, in violation of the intent and purposes specified, the things described in §§ 1 (b) and 2 (a) without regard to their connection with the places and things of 1 (a).

In each of these sections the document or other thing protected is required also to be "connected with" or "relating to" the national defense. The sections are not simple prohibitions against obtaining or delivering to foreign powers information which a jury may consider relating to national defense. If this were the language, it would need to be tested by the inquiry as to whether it had double meaning [7] or forced anyone, at his peril, to speculate as to whether certain actions violated the statute.[8] This Court has frequently held criminal laws deemed to violate these tests invalid. *United States* v. *Cohen Grocery Co.*,[9] urged as a precedent by petitioners, points out that the statute there under consideration forbade no specific act,[10] that it really punished acts "detrimental to the public interest when unjust and unreasonable" in a jury's view. In *Lanzetta* v. *New Jersey* [11] the statute was equally vague. "Any person not engaged in any lawful occupation, known to be a member of any gang . . . , who has been convicted at least three times of being a disorderly person, or who has been convicted

---

[7] *United States* v. *Reese*, 92 U. S. 214.

[8] *Lanzetta* v. *New Jersey*, 306 U. S. 451.

[9] 255 U. S. 81, 89.

[10] "That it is hereby made unlawful for any person willfully . . . . to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries." Act of October 22, 1919, c. 80, § 2, 41 Stat. 297.

[11] 306 U. S. 451.

of any crime in this or any other State, is declared to be a gangster . . ." We there said that the statute "condemns no act or omission"; that the vagueness is such as to violate due process.[12]

But we find no uncertainty in this statute which deprives a person of the ability to predetermine whether a contemplated action is criminal under the provisions of this law.[18] The obvious delimiting words in the statute are those requiring "intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign

---

[12] Criminal statutes deemed vague: *International Harvester Co.* v. *Kentucky*, 234 U. S. 216, 221–224 (raising prices above "market value under fair competition, and under normal market conditions"); *Collins* v. *Kentucky*, 234 U. S. 634 (same); *Weeds, Inc.* v. *United States*, 255 U. S. 109 (exacting "excessive prices for any necessaries"); *Stromberg* v. *California*, 283 U. S. 359, 369 (displaying any "symbol or emblem of opposition to organized government"); *Smith* v. *Cahoon*, 283 U. S. 553, 564–565 (such provisions regulating common carriers as could constitutionally be applied to private carriers); *Herndon* v. *Lowry*, 301 U. S. 242, 261–264 (distribution of pamphlets intended at any time in the future to lead to forcible resistance to law).

[18] Cf. Adequately definite criminal statutes: *Lloyd* v. *Dollison*, 194 U. S. 445, 450 (liquor restrictions varying according to sale at "wholesale" or "retail"); *Waters-Pierce Oil Co.* v. *Texas (No. 1)*, 212 U. S. 86, 108–111 (contracts "reasonably calculated" or which "tend" to fix prices); *Nash* v. *United States*, 229 U. S. 373, 376–378 (unreasonable or undue restraints of trade); *Omaechevarria* v. *Idaho*, 246 U. S. 343, 345, 348 ("any cattle range previously . . . or . . . usually occupied by any cattle grower"); *Hygrade Provision Co.* v. *Sherman*, 266 U. S. 497, 501–503 (meat represented to be "kosher"); *Miller* v. *Oregon*, 273 U. S. 657 (dangerous rate of speed; see 274 U. S. at 464–465); *United States* v. *Alford*, 274 U. S. 264, 267 (building fires "near" any forest or inflammable material); *United States* v. *Wurzbach*, 280 U. S. 396, 399 (receiving contributions for "any political purpose whatever"); *United States* v. *Shreveport Grain & Elevator Co.*, 287 U. S. 77, 81–82 ("reasonable variations" in weight or measure); *Kay* v. *United States*, 303 U. S. 1, 8–9 ("ordinary fees . . . for services actually rendered").

nation." This requires those prosecuted to have acted in bad faith. The sanctions apply only when *scienter* is established.[14]  Where there is no occasion for secrecy, as with reports relating to national defense, published by authority of Congress or the military departments, there can, of course, in all likelihood be no reasonable intent to give an advantage to a foreign government.  Finally, we are of the view that the use of the words "national defense" has given them, as here employed, a well understood connotation.  They were used in the Defense Secrets Act of 1911.[15]  The traditional concept of war as a struggle between nations is not changed by the intensity of support given to the armed forces by civilians or the extension of the combat area.  National defense, the Government maintains, "is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness."  We agree that the words "national defense" in the Espionage Act carry that meaning.  Whether a document or report is covered by §§ 1 (b) or 2 (a) depends upon its relation to the national defense, as so defined, not upon its connection with places specified in § 1 (a).  The language employed appears sufficiently definite to apprise the public of prohibited activities and is consonant with due process.

At the conclusion of all the evidence petitioners sought a directed verdict of acquittal because (1) the innocuous character of the evidence forbade a conclusion that petitioners had intent or reason to believe that the informa-

---

[14] Cf.. *Hygrade Provision Co.* v. *Sherman*, 266 U. S. 497, 501.

[15] 36 Stat. 1084: "That whoever, for the purpose of obtaining information respecting the national defense, to which he is not lawfully entitled, goes upon any vessel, or enters any navy-yard, naval station, fort, battery, torpedo station, arsenal, camp, factory, building, office, or other place connected with the national defense, owned or constructed or in process of construction by the United States . . ."

tion was to be used to the injury of the United States or the advantage of a foreign nation and (2) the evidence failed to disclose that any of the reports related to or was connected with the national defense. As a corollary to this second contention, reversal is sought on the ground that the trial court overruled the petitioners' objection that as a matter of law none of the reports dealt with national defense. That is, as the trial court stated the objection, that "the jury has no privilege in determining whether or no any of these reports have to do with the national defense, that that is a matter for the Court and not for the jury, as a matter of law."

To justify a court's refusing to permit a jury to consider a defendant's intent in obtaining and delivering these reports, one would be compelled to conclude that nothing in them could be violative of the law. As they gave a detailed picture of the counter-espionage work of the Naval Intelligence, drawn from its own files, they must be considered as dealing with activities of the military forces. A foreign government in possession of this information would be in a position to use it either for itself, in following the movements of the agents reported upon, or as a check upon this country's efficiency in ferreting out foreign espionage. It could use the reports to advise the state of the persons involved of the surveillance exercised by the United States over the movements of these foreign citizens. The reports, in short, are a part of this nation's plan for armed defense. The part relating to espionage and counter-espionage cannot be viewed as separated from the whole.

Nor do we think it necessary to prove that the information obtained was to be used to the injury of the United States. The statute is explicit in phrasing the crime of espionage as an act of obtaining information relating to the national defense "to be used . . . to the advantage of any foreign nation." No distinction

is made between friend or enemy. Unhappily the status of a foreign government may change. The evil which the statute punishes is the obtaining or furnishing of this guarded information, either to our hurt or another's gain. If we accept petitioners' contention that "advantage" means advantage as against the United States, it would be a useless addition, as no advantage could be given our competitor or opponent in that sense without injury to us.

An examination of the instructions convinces us that no injustice was done petitioners by their content. Weighed by the test previously outlined of relation to the military establishments, they are favorable to petitioners' contentions. A few excerpts will make this clear:

"You are instructed that the term 'national defense' includes all matters directly and reasonably connected with the defense of our nation against its enemies. . . . As you will note, the statute specifically mentions the places and things connected with or comprising the first line of defense when it mentions vessels, aircraft, works of defense, fort or battery and torpedo stations. You will note, also, that the statute specifically mentions by name certain other places or things relating to what we may call the secondary line of national defense. Thus some at least of the storage of reserves of men and materials is ordinarily done at naval stations, submarine bases, coaling stations, dock yards, arsenals and camps; all of which are specifically designated in the statute. . . . You are instructed in the first place that for purposes of prosecution under these statutes, the information, documents, plans, maps, etc., connected with these places or things must directly relate to the efficiency and effectiveness of the operation of said places or things as instruments for defending our nation. . . . You are instructed that in the second place the information, documents or notes must relate to those an-

gles or phrases of the instrumentality, place or thing which relates to the defense of our nation; thus if a place or thing has one use in peacetime and another use in wartime, you are to distinguish between information relating to the one or the other use. . . .

"The information, document or note might also relate to the possession of such information by another nation and as such might also come within the possible scope of this statute. . . . For from the standpoint of military or naval strategy it might not only be dangerous to us for a foreign power to know our weaknesses and our limitations, but it might also be dangerous to us when such a foreign power knows that we know that they know of our limitations.

"You are, then, to remember that the information, documents or notes, which are alleged to have been connected with the national defense, may relate or pertain to the usefulness, efficiency or availability of any of the above places, instrumentalities or things for the defense of the United States of America. The connection must not be a strained one nor an arbitrary one. The relationship must be reasonable and direct."

Petitioners' objection, however, is that after having given these instructions, the court instead of determining whether the reports were or were not connected with national defense, left this question to the jury in these words:

"Whether or not the information, obtained by any defendant in this case, concerned, regarded or was connected with the national defense is a question of fact solely for the determination of this jury, under these instructions."

These quotations show that the trial court undertook to give to the jury the tests by which they were to determine whether the acts of the petitioners were connected with or related to the national defense. We are

of the opinion this was properly left to the jury. If we assume, as we must here after our earlier discussion as to the definiteness of the statute, that the words of the statute are sufficiently specific to advise the ordinary man of its scope, we think it follows that the words of the instructions give adequate definition to "connected with" or "relating to" national defense. The inquiry directed at the instructions is whether the jury is given sufficient guidance to enable it to determine whether the acts of the petitioners were within the prohibitions. These instructions set out the definition of national defense in a manner favorable and unobjectionable to petitioners. When they refer to facts connected with or related to defense, however, petitioners urge that the connection should be determined by the court. Instructions can, of course, go no farther than to say the connection must be reasonable, direct and natural. Further elaboration would not clarify. The function of the court is to instruct as to the kind of information which is violative of the statute, and of the jury to decide whether the information secured is of the defined kind. It is not the function of the court, where reasonable men may differ, to determine whether the acts do or do not come within the ambit of the statute. The question of the connection of the information with national defense is a question of fact to be determined by the jury as negligence upon undisputed facts is determined.[16]

In a trial under an indictment for violation of § 3 [17] of this same Espionage Act, this Court had occasion to con-

---

[16] *Grand Trunk Ry. Co.* v. *Ives*, 144 U. S. 408, 417; *Gunning* v. *Cooley*, 281 U. S. 90, 94. Cf. *Dunlop* v. *United States*, 165 U. S. 486, 500–501.

[17] 40 Stat. 217, 219, c. 30:

"Sec. 3. Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and who-

sider a similar question as to the function of the jury. A pamphlet was introduced as evidence of making false statements with the intent to cause insubordination. To the objection that the pamphlet could not legitimately be construed as tending to produce the prohibited consequences this Court said: "What interpretation ought to be placed upon the pamphlet, what would be the probable effect of distributing it in the mode adopted, and what were defendants' motives in doing this, were questions for the jury, not the court, to decide. . . . Whether the printed words would in fact produce as a proximate result a material interference with the recruiting or enlistment service, or the operation or success of the forces of the United States, was a question for the jury to decide in view of all the circumstances of the time and considering the place and manner of distribution." [18]

Viewing the instructions as a whole, we find no objection sufficient to justify reversal.

The Circuit Court of Appeals properly refused to consider the errors alleged with respect to the conspiracy count.[19]

*Affirmed.*

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

---

ever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service or of the United Staes, shall be punished by a fine of no more than $10,000 or imprisonment for not more than twenty years, or both."

[18] *Pierce* v. *United States,* 252 U. S. 239, 250. Justices Brandeis and Holmes dissented, largely on the ground that the jury should not be left to decide whether statements in the pamphlet were facts or conclusions. *Id.,* p. 269.

[19] *Brooks* v. *United States,* 267 U. S. 432, 441.