[Crim. No. 3740.   Second Dist., Div. One.   Jan. 12, 1944.]

THE PEOPLE, Respondent, v. JESSE LEE GORDON, Appellant.

Walter L. Gordon, Jr., for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

YORK, P. J.—On March 3, 1943, by an information containing two counts, appellant was charged with violations of

the Sabotage Prevention Act (Stats. 1941, ch. 184, p. 1240; Deering's 1941 Supp. to Gen. Laws, Act 8427).

Count I of said information charged that appellant on February 18, 1943, did "intentionally and maliciously injure and impair one Stearman Airplane properly designated as number 40-1693, the property of the United States Army used by the Mira-Loma Flight Academy on the Ventura County Airport at Oxnard for the training of air cadets for the United States Army Air Force, by cutting the under wing surface of said plane," said appellant "then and there well knowing that said act would interfere with the preparation of the United States for war, to-wit: the training of said air cadets for the United States Army Air Force . . ."

Count II charged an identical violation, except that the damage there charged occurred to another and different plane, No. 40-1644.

This appeal is prosecuted from the judgment of conviction of the offenses as charged which was rendered by the court sitting without a jury.

It is here urged (1) that the Sabotage Prevention Act, upon which the instant prosecution is based, is unconstitutional; and (2) that the evidence is insufficient to justify the decision.

The charge of unconstitutionality is directed toward section 2 of said act, to wit:

"Whoever intentionally and maliciously destroys, impairs, injures, interferes or tampers with real or personal property *with reasonable grounds to believe that such act will hinder, delay or interfere with the preparation* of the United States or any of the States for defense or for war, or with the prosecution of war by the United States, shall be punished by imprisonment for not more than 10 years, or by a fine of not more than ten thousand dollars ($10,000), or both; provided, if such person so acts with the intent to hinder, delay or interfere with the preparation of the United States or any of the States for defense or for war, or with the prosecution of war by the United States, the minimum punishment shall be imprisonment for not less than one year." —it being urged "that a person of common intelligence cannot understand just what is meant by 'reasonable grounds' in the Statute. The law as enacted leaves it to a Court or Jury to determine whether the Defendant had reasonable grounds to believe

his act would hinder the war effort. Under the law as enacted a different Court or Jury might under the same set of facts arrive at two entirely different conclusions. For the act to be constitutional, the 'reasonable grounds' should be enumerated. . . .''

The purpose of the Model Sabotage Act, which was drafted by a nation-wide group aiming to guard against sabotage, is stated as follows in 54 Harvard Law Review 602:

''The prevention of sabotage is a vital cog in the machinery of national defense. Sabotage is far more dangerous now than it has ever been in the past, because in the mechanized war of today the products of the factory are essential to the success of the army. In the First World War, armies required quite some mechanical equipment, but today the need not only for guns but for airplanes, tanks and trucks as well is many times as great. If our country is to prepare for a possible modern war and is actively to pursue its now openly-avowed policy to assist England in defeating the Axis powers, every available factory must work at top speed. Destruction of machinery, factories and utilities will spell defeat just as surely as rout in the field.''

The Sabotage Prevention Act, *supra,* was enacted by the California Legislature as an emergency measure, and in section 16 thereof is contained a statement of the facts constituting the necessity for its enactment, i.e.: ''An emergency exists in the United States and the State of California in providing adequate armies and facilities of defense. There is need of the full capacity of factories, warehouses and transportation in order to effect the rapid rearmament of the Nation, and any injury or damage to these facilities would seriously affect the security of the United States and the State of California, and it is therefore necessary that this act take effect immediately.''

The language used in section 31 of the Federal Espionage Act (Title 50, USC) is comparable to that used in section 2 of the California Sabotage Prevention Act here under consideration:

''Whoever, for the purpose of obtaining information respecting the national defense with intent or *reason to believe* that the information to be obtained is to be used to the injury of the United States . . ., or (b) whoever, for the purpose aforesaid, and with like intent or *reason to be-*

*lieve,* copies . . . anything connected with the national defense . . . or (c) whoever, for the purpose aforesaid, receives . . . any document . . . connected with the national defense, knowing or *having reason to believe,* at the time he receives . . . it . . . that it will be . . . disposed of to any person contrary to the provisions of this title. . . .''

The case of *Gorin* v. *United States,* 312 U.S. 19, 27 [61 S.Ct. 429, 85 L.Ed. 488, 494], decided January 13, 1941, considered the Federal Act which was therein challenged on constitutional grounds, it being claimed that the statute was uncertain. As to this contention the court held as follows: ''But we find no uncertainty in this statute which deprives a person of the ability to predetermine whether a contemplated action is criminal under the provisions of this law. The obvious delimiting words in the statute are those requiring 'intent or reason to believe that the information to be obtained is to be used to the injury of the United States. . . .' ''

■ It is stated in 5 Cal.Jur. 632, that ''One who assails the constitutionality of a statute must not only overcome the strong presumption in favor of its validity, but must show that by the natural and necessary import of the language it is clearly in conflict with the supreme law.'' Appellant has not met this requirement.

Any person of ordinary intelligence should realize, i.e., *have reasonable grounds to believe,* that the act of cutting the wings of an airplane then being used to train air cadets for the United States Army would result not only in rendering such plane useless, but as well cause injury or loss of life to those cadets attempting to use such plane without knowledge that it had been damaged.

■ There is no merit in appellant's point that ''for the act to be constitutional, the 'reasonable grounds' should be enumerated.''

Appellant, as an employe of the flight academy, was in a position to know that the partial destruction of the two planes would interfere with the training of the air cadets, and thus hinder the preparation of the United States for war.

■ Appellant also contends that the evidence is insufficient to sustain his conviction because (1) of failure to show that he had reasonable grounds to believe his act would hinder the war effort; and (2) no evidence was offered to show how

or in what manner the war effort would be hindered by the rips found in the planes.

In this connection, appellant points out that the witness Wagner testified that "sometimes upon examination of planes coming out of the air they would find holes or tears in the wings due to weather conditions. This being true, the fact that appellant, if he did stick a hole in the airplane wing negates any theory that this act did hinder the war effort. Also, the witness testified that one of the planes that was supposedly slashed had been in the air that same morning and no testimony was adduced or offered to show that the war effort was in any manner impeded."

The witness Wagner was the Chief Aircraft Inspector for the Army at the Mira Loma Flight Academy. He testified that on February 18, 1943, he examined plane number 40-1644 (known as field No. 3) and found "a cut on the upper surface of the right elevator approximately 7 inches in length"; also, that he examined plane number 40-1693 (field No. 4) and discovered that "The under surface of the lower left wing was cut approximately twelve feet in length, which is almost the entire length of the wing. . . . It was cut intermittently the entire length." He also testified that these planes were being used on the date in question "for training air cadets for the United States Army," and were lined up in rows across the field with a parking space between each plane of approximately four feet.

Plane No. 3 to which the damage was limited to a seven inch cut did go into the air that morning, but plane No. 4, the wing of which had been cut almost its entire length—a distance of twelve feet, did not go into the air.

The witness Wagner on cross-examination testified that "Occasionally we find a hole punctured in the fabric or a tear, because in the wooden structure the wires would break off, but it was all caused by a specific cause. Q. I am not asking that, I am just asking what you found. You say you have found tears in planes coming out of the air, outside of these four ships, what is the longest tear you have found previous to this? A. I would say a tear of *approximately 5 inches,* more of a ragged tear."

The record discloses that appellant was employed in August of 1941 at the flight academy as a washer of planes. On November 21, 1942, "he was on the line cranking planes" when he walked off the job and was discharged. On Decem-

ber 4, 1942, he was rehired and went on officially as a mechanic's helper. "The duties of a cranker are to be on the line when the ships need cranking. They crank them and then check them for any damage which might have occurred during a flight, keep the windshield clean and various jobs to keep the plane flying on the flight line." Appellant worked a shift from 5:00 a.m. to 1:30 p.m., and the squadrons of cadets in training start flying about 8:00 a.m., it taking about 15 or 20 minutes to get them into the air. When the crankers have completed their duties of cranking, they keep the planes serviced and perform such other duties as are necessary. The crew chief assigns them to a flight and they stay on the home field at Oxnard or one of the auxiliary fields.

John Smith, a co-worker, testified that when he and appellant were cranking the ships on February 18, 1943, appellant told him "He said he thought he was going to cut some ships." That he saw appellant go around toward plane No. 3 and the witness heard something tear; that then appellant walked around toward the fourth plane, and the witness "heard something else tear." Appellant then rejoined said Smith and said " 'You didn't see nothing,' and I said 'No.' " Appellant took the stand in his own defense, and accused the witness John Smith of having damaged the two planes in question.

There was also evidence attempting to show that appellant was disgruntled because he did not progress as fast as he believed he should, and that he cut the planes in order to get even with Mr. Cooper, his superior officer, who was aircraft mechanic superintendent of units at the flight academy.

There were many conflicts in the evidence, but an examination of the entire record reveals sufficient substantial evidence to support the judgment of conviction. Moreover, the effect of cutting the wings of an airplane is self-evident.

For the reasons stated, the judgment appealed from is affirmed.

Doran, J., and White, J., concurred.