## UNITED STATES v. LEINER.

### No. 356.

Circuit Court of Appeals, Second Circuit.

June 21, 1944.

John W. Burke, Jr., of New York City, for appellant.

Bruno Schachner, of New York City, for appellee.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

---

L. HAND, Circuit Judge.

This case comes up upon an appeal from a judgment of conviction, entered upon a plea of guilty to counts one, three and four of an indictment for violation of the "Trading With The Enemy Act." § 3(a) and § 16 of 50 U.S.C.A.Appendix. The substance of count one is as follows: Leiner, the accused, "on the 22nd day of June, 1942 * * * did trade with another person with reasonable cause to believe that such other person was an enemy of the United States" in that he "did receive property, to wit, currency in the sum of $50. for the purpose of changing the same from Edward John Kerling with reasonable cause to believe that the said Edward John Kerling was an agent of the Government of the German Reich," with which the United States was then at war. The third count was exactly like the first, except that it laid a second transaction with Kerling on the twenty-third day of June; the fourth count was also like the first, except that it laid a transaction on June 23rd with one Hedwig Engemann, whom Leiner had reasonable cause to believe was "conducting and taking part in said trade on behalf of" Kerling. Upon this appeal the points raised are; first that the acts alleged were not a crime under § 3(a) of the "Trading With The Enemy Act"; second, that the indictment did not allege that Kerling was in fact an agent of the Reich, but only that Leiner had reasonable cause to believe so; and third, that the statute was unconstitutional because it was too vague. At the outset, we may dispose of the last objection merely by reference to Nash v. United States, 229 U.S. 373, 377, 378, 33 S.Ct. 780, 57 L.Ed. 1232; Gorin v. United States, 312 U.S. 19, 27, 28, 61 S.Ct. 429, 85 L.Ed. 488; United States v. Ragen, 314 U.S. 513, 523, 62 S.Ct. 374, 86 L.Ed. 383.

Section 3(a) of the act makes unlawful—among other things—"trade * * with * * * any * * * person, with knowledge or reasonable cause to believe that such * * * person is an enemy": § 16 sets the penalties. Section 2 of the act, 50 U.S.C.A.Appendix § 2, defines an "enemy" as including an "agent" of "the government of any nation with which the United States is at war" ; and "trade" as including to "exchange * * * transfer * * * or receive any form of property," and as including also "to have any form of * * * commercial communication or intercourse with." If § 3(a) was in force, as it was unless the President had licensed the transactions charged in the indictment (which he had authority to do), they were crimes, and the judgment was correct. Thus, the appeal turns upon whether the President had granted such a license, and that depends upon a mass of complicated verbiage, not altogether consistent. Section 5(b) (1) (B) of the act, as amended on December 18, 1941, 50 U.S. C.A.Appendix § 5(b) (1) (B), gave the President power, among other things, to "prohibit, any * * * transfer * * * or dealing in * * * any property in which any foreign country or a national thereof has any interest." On April 10, 1940, the President issued what is known as the "Freezing Order," (Executive Order No. 8389, 12 U.S.C.A. § 95 note), by which he prohibited—except as the Secretary of the Treasury should otherwise authorize—many transactions, but among them were not those charged in the indictment. Such transactions neither the President nor any delegate of his, ever did prohibit, although the language just quoted from § 5(b) (1) (B) would have made them unlawful, had he done so. On February 12, 1942, the President delegated to the Secretary all his powers under § 3(a) and § 5(b) ; and, although he revoked this order on March 11, 1942, and conferred the same powers upon the Alien Property Custodian, that official in his turn retransferred them back for the time being to the Secretary on March 13.

So matters stood on March 18, 1942, when the Secretary of the Treasury promulgated "General Ruling No. 11," in four sections. Section one provided generally that "no license * * * shall be deemed to authorize any transaction which * * involves any trade or communication with an enemy national." Section two defined, among other terms, the meaning of "trade or communication"—§ 2(d)—; section three is irrelevant here; and section four declared that "any transaction prohibited by section 3(a) * * * is licensed thereunder unless such transaction is prohibited pursuant to section 5(b) * * * and not licensed by the Secretary of the Treasury." This section concluded by a reference to a general license issued by the President on December 13, 1941, which covered "any transaction * * * prohibited by section 3(a) * * * provided * * * that such transaction is authorized by the Sec-

retary * * * pursuant to Executive Order No. 8389"—the "Freezing Order." This license did not cover the transactions at bar, because they were not within the "Freezing Order"; the Secretary could not have "authorized" them "pursuant to" that order, and never tried to. Thus, they continued to be forbidden by § 3(a) of the act, unless they were licensed by § 4 of the General Ruling itself. The Ruling prohibited nothing; § 1 and § 2 merely invalidated some kinds of existing or future licenses ("No license * * * shall be deemed to authorize" etc.); and § 4 affirmatively licensed all violations of § 3(a) of the act with the exception already noted of transactions prohibited "pursuant to § 5(b)" of the act. Since, as we have seen, the only transactions ever prohibited "pursuant to" that section, were those covered by the "Freezing Order," and since the "Freezing Order" did not prohibit those charged in the indictment, there can be no question that, if § 4 of the Ruling be read alone, the indictment did not charge any crime. But that section cannot be read alone. Section 2(d) defined "trade" so as to include any "taking," and "property" so as to include "currency," (subdivision ii); and § 1 so interpreted, therefore enacted that no license should "be deemed to authorize any transaction which * * * involves" "taking * * * currency" from an enemy national. As we have seen, § 3(a) forbad such a transaction unless licensed.

Thus we have a square conflict between § 4 of the Ruling and §§ 1 and 2(d): § 1 denied any license to the transaction charged in the indictment; § 4 granted one. The predominant intent is nevertheless apparent. Section 5(b) of the act was not confined to a time of war; it included also a "period of national emergency," and the transactions which it covered were not confined to transactions with enemies; it gave the President power to impound the credits and money of all aliens—neutral as well as enemy—and to prevent their transfer; and that was the purpose of the "Freezing Order." But when § 3(a) came into effect, flagrante bello, all transactions with enemies which were within the "Freezing Order," fell under an added ban, and the order of December 13, 1941, was to give the Secretary of the Treasury the same power to license them which he had had under the "Freezing Order"; while all those which were within § 3(a), but not within

the "Freezing Order," remained unlicensed. The reference in § 4 of the Ruling to the order of December 13, 1941, itself goes far to show the limited purpose of the section as a whole. But there is more. As § 4 reads, it licenses, as we have said, every violation of § 3(a) which is not also a violation of the "Freezing Order." Now, while it is true that §§ 1 and 2 of the Ruling include more than what § 3(a) of the act forbids, nevertheless § 3(a) is the only section that unconditionally prohibits any "trading" whatever; and the very name of the act shows that trading with the enemy was its chief concern. On this account alone it is highly improbable that the Secretary intended to license all trading with the enemy except such as the "Freezing Order" prohibited, for that order only touched such transactions as it was thought fitting to deny to neutrals—there being indeed only neutrals, when it was promulgated.

Moreover, so to construe § 4 would raise insuperable textual difficulties; it would delete the whole of § 2(d) (ii), except so far as § 2(d) (ii) coincided with the "Freezing Order"; and it did not coincide at all. The "Freezing Order" covered only —(A and B)—transfers or payments between banks—(C)—"transactions in foreign exchange"—(D)—the withdrawal of "earmarking" of bullion, currency and the like—and—(E)—the transfer of stocks and bonds. It was utterly inadequate for the protection of a nation at mortal grips with what then appeared to be the two strongest military powers. On the other hand, § 2(d) (ii) was cast in adequate terms for just that end; it included every kind of property, and was plainly intended to deny all licenses under § 3(a) of the act, except as they fell within the "Freezing Order." For these reasons it seems to us plain that § 4 of the Ruling meant no more than to remove from the sweeping abolition of all licenses of § 1, those which the Secretary of the Treasury might issue pursuant to the "Freezing Order." While indeed that does violence to its terms, it is the only interpretation which avoids making the Ruling as a whole absurd. Moreover, as we have said, it falls in with the mention in § 4 itself of the order of December 13, 1941.

 There remains the question whether the indictment should have charged that Kerling was in fact an "agent" of the German Reich; and not merely that Leiner thought him to be so. We agree that Congress did not mean to

make it a crime to trade with a person, not in fact an "enemy," even though the accused had cause to believe that he was; the statute was aimed at protecting the nation, not at punishing persons, however ill-disposed, who did it no harm. And, indeed, the earlier part of § 3(a) itself presupposes that the person traded with shall be in fact an enemy; the license is described as "granted to such person, or to the enemy." The indictment was therefore faulty. Nevertheless, the purport of the charge was plain enough; it would be silly to suppose that the accused could be misled in his defense because he thought that the prosecution did not mean to charge that Kerling was in fact an "agent" of the Reich. The objection falls within § 556 of Title 18, U.S.C.A.

Conviction affirmed.