**UNITED STATES v. ROSENBERG et al.**

No. C134–245.

United States District Court
S. D. New York.

Jan. 2, 1953.

Myles J. Lane, U. S. Atty., James B. Kilsheimer, III, Asst. U. S. Atty., for United States.

Emanuel H. Bloch, for defendants.

IRVING R. KAUFMAN, District Judge.

Having virtually exhausted every avenue of judicial review of their convictions, Julius and Ethel Rosenberg now move for a reduction of the sentences of death which this Court imposed on April 5, 1951,[1] subsequent to the conviction of the Rosenbergs, after trial by jury of the crime of having conspired between 1944 and 1950 to violate Title 18, United States Code, Section 794, by combining among themselves and with others to communicate to the Union of Soviet Socialist Republics documents, writings, etc., relating to the national defense of the United States, with intent and reason to believe that the matter transmitted would be used to the advantage of the Soviet Union. The government opposes the motion.

The conviction has been examined and affirmed by the Court of Appeals, 2 Cir., Feb. 25, 1952, 195 F.2d 583, rehearing denied April 8, 1952, 195 F.2d 609.[2] The Supreme Court declined to review the case, Oct 13, 1952, 344 U.S. 838, 73 S.Ct. 20. The defendants then applied to the Supreme Court of the United States for rehearing on their application for certiorari which was also denied. Nov. 17, 1952, 344 U.S. 889, 73 S.Ct. 134.

Thereafter the defendants made an application to the District Court to set aside the judgment pursuant to Title 28, United States Code, Section 2255. I asked to be relieved of the necessity of hearing that application. Accordingly, the application was heard by the Honorable Sylvester J. Ryan of this Court and was denied on December 10, 1952, 108 F.Supp. 798. An appeal was taken from that decision to the United States Court of Appeals which unanimously affirmed, 2 Cir., Dec. 31, 1952, 200 F.2d 666.

In response to this application, I have not only heard counsel at great length and studied the defendants' petition but have also re-studied the voluminous record of the trial and refreshed my recollection of the demeanor of the witnesses. Re-examining the question de novo, I am again compelled to conclude that the defendants' guilt—as found by the unanimous verdict of the jury —was established beyond doubt. None of the so-called later discoveries or revelations which counsel contend create doubt of guilt touch the basic matters disclosed by the testimony of Ruth and David Greenglass, Max Elitcher, Ben Schneider, and the other government witnesses, which the jury chose to believe and which points unmistakably to the full and conscious participation of the defendants in this conspiracy. On this application baseless charges of perjury have been hurled at several government witnesses. The jury has already decided this question to the contrary, so did my colleague Judge Ryan, so did the United States Court of Appeals. I am also convinced that these witnesses told the truth. There-

1. Rule 35 of the Federal Rules of Criminal Procedure, 18 U.S.C., provides inter alia that:

"The court may reduce a sentence within 60 days after * * * receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 60 days after receipt of an order of the Supreme Court denying an application for a writ of certiorari."

2. The evidence was well summarized in this opinion, 195 F.2d at pages 588–590.

fore we observe several judicial determinations attesting to the credence of the challenged government witnesses.

The issue which now confronts this Court therefore is whether, assuming the guilt of the defendants, and the overwhelming character of the evidence renders such assumption inescapable, there nevertheless exist other considerations which would warrant reduction of the sentence.

The statute under which the Court imposed sentence provides for a maximum prison sentence of 30 years,[3] or death.[4] The Court was not empowered to impose a life sentence even if it had entertained such thought.

At the time of the original sentence I had the benefit of days of deliberation and study of the record in addition to a vivid recollection of the conduct of the witnesses. Since the time of the sentences I have had approximately 21 months to reconsider, to re-examine the record, to meditate and search my conscience. It would be, indeed, simple and less trying upon this Court were I to dispose of the Rosenbergs' application by reducing the sentences. I stated at the time of the original sentences (p. 2454),

"* * * it is only human to be merciful and it is natural to try to spare lives."

The Court, however, has had a solemn trust placed in its hands by the people of this land and I am convinced that any change of these sentences by this Court, in the light of the evidence adduced in this case, would be a violation of that trust. Devotion to duty and justice must prevail over action which could be attributable only to the emotions.

We are dealing with the type of offense which is a crime of the mind and the heart. While the law under which the defendants Rosenberg were convicted does not recognize degrees of their offense, the court may, upon sentencing, take that factor into consideration. Their traitorous acts were of the highest degree. They turned over information to Russia concerning the most deadly weapon known to man thereby exposing millions of their countrymen to danger or death.

The Rosenbergs were not minor espionage agents; they were on the top rung of this conspiracy. Julius had direct contact with the representative of the foreign government, to wit, Yakolev, a Russian Vice-Consul in New York City. He had contacts with other representatives of the U. S. S. R. He disbursed large amounts of Russian espionage funds—for example the $5,000 given to Greenglass to flee the jurisdiction. He was always the principal recruiter for scientists and technicians and the guiding spirit of the conspirators. And at all times Ethel Rosenberg, older in years, and wise in Communist doctrine, aided and abetted and advised her husband.

Throughout history the crimes of traitors stand as those most abhorred by people. At the time of the imposition of the sentences in this case I pointed out that the crime for which these defendants stood convicted was worse than murder. The distinction is based upon reason. The murderer kills only his victim while the traitor violates all the members of his society, all the members of the group to which he owes his allegiance. Our forebears attached extreme odium to the crime of betraying one's country. (Pound, Criminal Justice in America 103 (1945); 4 Blackstone Commentaries, 93). The fact that the acts of the defendants were not characterized as treason, or that the indictment in this case was not one for treason, does not reduce the enormity of the offense, for the United States Supreme Court pointed out in Cramer v. U. S., 1944, 325 U.S. 1, 45, 65 S.Ct. 918, 939, 89 L.Ed. 1441:

"* * * the treason offense is not the only nor can it well serve as the principal legal weapon to vindicate our national cohesion and security. In debating this provision, Rufus King

3. A 30 year sentence would make the offender eligible for parole after service of one-third of his sentence, i. e., in 10 years. Title 18, United States Code, § 4202.

4. Title 18, United States Code, § 794(b); "Whoever violates subsection (a) in time of war shall be punished by death or by imprisonment for not more than thirty years."

observed to the Convention that the 'controversy relating to Treason might be of less magnitude than was supposed; as the legislature might punish capitally under other names than Treason.' (2 Farrand 347)."

In the many letters urging judicial clemency, which have been submitted to this Court, the overwhelming preponderance of which are in response to a self-serving solicitation by counsel for the Rosenbergs, it has frequently been urged that the sentences were unprecedented, being the first such sentences imposed for peacetime espionage. I hasten to correct this misapprehension and emphasize, therefore, that the sentences were not imposed for peacetime espionage but for wartime espionage. This court would not have the power to impose these sentences for peacetime espionage.[5] The letters referred to, for the greater part indicate that the writers have never read the record, are unfamiliar with the facts in the case, or have been misinformed concerning them. Some of these writers do not hesitate to pass judgment on the credibility of witnesses even though they have not observed them on the witness stand, a basic essential to judging credibility. They nevertheless assume the role of a super-jury, sitting in absentia.

While it is true that these sentences are in some respects unprecedented, we are all cognizant of the fact that we are not living in a static world; times change and conditions change. Indeed, it has been recognized that punishment for traitorous acts was little used in the past because of our position of great internal and external security. The following passage is found in Hurst, Treason in the United States, 58 Harv.Law Review, 226, 806 (1945).

"As the Supreme Court observed in the Cramer case (65 Sup.Ct. at 931) 'we have managed to do without the treason prosecutions to a degree that probably would be impossible except while a people was singularly confident of external security and internal stability.' (Cf. 2 Stephen, a History of the Criminal Law of England (1883) 251, 283."

Can it be said that we are today singularly confident of external security and internal stability?

When several German spies were apprehended on our shores soon after their arrival, and executed after a military trial for the crime of espionage in 1942, few, if any, voices were heard in opposition to this course of conduct by our government. Perhaps the offense of these offenders was brought home in a more dramatic fashion for they were representatives of a foreign nation at war with us. Is the act not perhaps more treacherous and reprehensible when our own fellow Americans decide to traffic in our deepest military secrets and to transfer the information concerning these secrets to a foreign power while we are engaged in war; then continue to traffic in our military secrets when this allegedly friendly country becomes hostile to us and engages in a cold war with America? We can expect citizens of a foreign nation to to do everything to benefit their country but we have a right to expect Americans not to enlist in a conspiracy to destroy their own country.

The law under which these defendants were convicted was enacted in 1917, at a time when the atom bomb was non-existent. The law provides that if acts of espionage are committed in time of war the court can impose a maximum prison sentence of 30 years, or death. It is difficult to imagine acts of espionage, at any time presented to a court, which could be of greater consequence than those presented by this case.

But the Rosenbergs urge that Russia was our ally in 1944 and 1945 and hence this Court in imposing sentence was using hindsight. To accept this contention is to approve the theory that this is not a government of responsible civil and military leaders, charged with the duty of determining what military secrets are to be given to a foreign power, but that the decision rests with any individual who might be disgruntled with the determination made by our leaders on matters affecting our security. Such a government, it is quite obvious, could not long exist. The ultimate end would be anarchy; each individual

5. See footnote (4) supra.

would decide for himself what is best for our country and then pursue that end.

Furthermore, Congress wisely did not distinguish between a friendly or an enemy country in prescribing punishments for acts of espionage. The law was intended to protect and to keep inviolate our military secrets from all foreign powers. That there was good reason for this was pointed out by the United States Supreme Court in upholding the constitutionality of this statute by a unanimous Court in Gorin v. United States, 1940, 312 U.S. 19, 29–30, 61 S.Ct. 429, 435, 85 L.Ed. 488, where the Court said:

> "The statute is explicit in phrasing the crime of espionage as an act of obtaining information relating to the national defense 'to be used * * * to the advantage of any foreign nation.' *No distinction is made between friend or enemy. Unhappily the status of a foreign government may change.* The evil which the statute punishes is the obtaining or furnishing of this guarded information, either to our hurt or another's gain." (Emphasis supplied.)

Our leaders, charged with the responsibility of making the decision to give to, or withhold security information from a foreign power, had determined to withhold from this totalitarian government information concerning the most deadly weapon known to man, a weapon which gave America superiority in military weapons. Should the Rosenbergs with their dedication to Soviet Russia have been free to over-ride the decision of our government on this crucial matter? Should any individual have such a right regardless of the country he intends to benefit? The answer is self-evident.

Furthermore, the evidence is clear that the conspiracy continued right down to 1950. The United States Court of Appeals, commented, 195 F.2d at page 608.

> " * * * the trial judge, in sentencing the Rosenbergs, relied on record evidence which (if believed) shows a very different picture. If this evidence be accepted, the conspiracy did not end in 1945, while Russia was still a

'friend,' but, as the trial judge phrased it, continued 'during a period when it was apparent to everybody that we were dealing with a hostile nation.' For, according to government witnesses, in 1948 Julius Rosenberg was urging Elitcher to stay with the Navy Department so that he might obtain secret data; in 1948, Rosenberg received 'valuable' information from Sobell; in 1950, Rosenberg gave Greenglass money to flee to Russia. This court cannot rule that the trial judge should have disbelieved those witnesses whom he saw and heard testify.

> " * * * the trial judge could properly consider the injury to this country of their conduct, in exercising his discretion as to the extent of sentences within the statutory limits."

The last quoted statement should dispose of the defendants' contention that their culpability is to any degree lessened by virtue of the absence of an allegation in the indictment of intent to injure this country. As the Supreme Court said in Gorin v. United States, supra, 312 U.S. at pages 29, 30, 61 S.Ct. at page 435:

> "Nor do we think it necessary to prove that the information obtained was to be used to the injury of the United States. The statute is explicit in phrasing the crime of espionage as an act of obtaining information relating to the national defense 'to be used * * * to the advantage of any foreign nation.' * * * If we accept petitioners' contention that 'advantage' means advantage as against the United States, it would be a useless addition, *as no advantage could be given our competitor or opponent in that sense without injury to us.*" (Emphasis supplied.)

Judge Jerome Frank concluded the opinion of the United States Court of Appeals as follows, 195 F.2d at page 609.

> "We must, then, consider the case as one in which death sentences have been imposed on Americans who conspired to pass important secret information to Russia, not only during

1944–1945, but also during the 'cold war.' Assuming the applicability of the community-attitude test proposed by these defendants, it is impossible to say that the community is shocked and outraged by such sentences resting on such facts. * * *"

Apart from these considerations, the defendants can draw little comfort from their argument that the Soviet Union was an ally of the United States when this conspiracy began. This contention evaporates in the face of evidence that their acts' of espionage did not cease upon the termination of hostilities but continued and intensified in the post-war years when it was apparent that Russia had become hostile to the United States. Furthermore, no one was more aware than the defendants of the true nature of an "ally" which would take these furtive steps to set up an extensive espionage network in our country to steal our most vital secrets.

In Canada, in Britain and in the United States the Soviet Union had its spies busy in this traitorous work. These defendants knew all this as well as the Kremlin itself, because they were themselves part of that conspiracy—indeed they were leaders in it. Even as the Soviet Union took all our help and demanded more, while we were battling a common enemy, they were stealthily picking our pockets of our most secret atomic data. What right have these defendants now to cry "Russia was our ally" when they were the very ones caught with their hands in our pockets trying to filch from their own country this weapon which, were its secret inviolate, might have been crucial in maintaining peace in the post-war world. It is apparent that Russia was conscious of the fact that the United States had the one weapon which gave it military superiority and that, at any price, it had to wrest that superiority from the United States by stealing the secret information concerning that weapon. The tragedy of it is that it was successful.

The defendants contend that the acts of which they have been found guilty were not detrimental to the United States or of benefit to the Soviet Union, because the information which was transmitted to the Russian agents was not secret but was available in publicly distributed scientific periodicals. But it is ludicrous to assert that the defendants' elaborate precautions to escape detection and the furtive conduct which characterized all their acts as members of the Soviet-run espionage ring were directed at the attainment of information already in the public domain. Suffice it to say that the jury found the documents to be secret and the Court of Appeals in affirming stated that the defendants "conspired to pass important secret information to Russia". Supra 195 F.2d at page 609.

It has also been urged that others have received lesser sentences. Indeed, this Court imposed a lesser sentence upon the co-conspirator, David Greenglass. There are several answers to this. The degree of implication of each conspirator and his subsequent aid to the government in ferreting out co-conspirators must be considered. Julius and Ethel Rosenberg were the prime movers in this conspiracy; into it they sucked David and Ruth Greenglass. Indeed, Ruth Greenglass did not know what her husband was doing in Los Alamos until Julius had told her that David was working on the atom bomb and that he wanted information which he specified in detail.

Not of little importance in connection with the Greenglass sentence, is the cooperation which the government received from him, a factor which I publicly stated at the time of his sentence deserved consideration from the Court. The Court stated then at pp. 2493, 2494:

"* * * by your assistance in this case you have helped us strike a death blow to the trafficking in our military secrets, to the advantage of a foreign nation. Uncovering all other espionage rings, which I am certain exist depends to a great extent upon the testimony of those members of the ring who recant, and seek to atone for their sins in some measure. * * *. You repented and you brought to justice those who enlisted you in this cause. * * *.

"Justice does not seek vengeance—justice seeks justice, but you deserve

punishment, punishment which balances the gravity of your offense as against your aid."

Neither defendant has seen fit to follow the course of David Greenglass and Harry Gold. Their lips have remained sealed and they prefer the glory which they believe will be theirs by the martyrdom which will be bestowed upon them by those who enlisted them in this diabolical conspiracy (and who, indeed, desire them to remain silent).

Harry Gold received the maximum prison sentence of 30 years from the Honorable James P. McGranery, then a United States District Judge in Philadelphia. Gold has been a most cooperative and penitent witness since his apprehension. He has testified at several trials, before several Grand Juries, and unquestionably due consideration was given by Judge McGranery to Gold's expression of his intention to cooperate.

Klaus Fuchs received the maximum prison sentence under the English law and his cooperation is now a matter of record. It was the result of Klaus Fuchs' confession that the trail ultimately led to these defendants. It should be noted that Fuchs was not convicted of violating an espionage statute but of violating an act known as the Official Secrets Act. To be bound by the sentences imposed on Fuchs and Alan Nunn May, would be to say that this country has no right to pass its own laws to deal with offenses as its Congress determines but must blindly follow the law of a foreign nation even though it materially differs from our own. Of course, both Fuchs and May pleaded guilty.[6]

The defendants were born in America, reared in America and educated in the public schools of America. They had lived their entire lives among us; they had all the advantages of our free institutions and had enjoyed the privileges of American citizenship. They have been allowed to progress and develop in freedom and self-respect. As citizens of America, being numbered as one of us, they chose the path of traitors and decided to abandon those who had nurtured and fed them in favor of a nation whose ideology was repugnant to everything we have learned, lived for and to which we have been dedicated. They knew well that the stakes were high and the consequences of failure were dire.

This Court has no doubt but that if the Rosenbergs were ever to attain their freedom, they would continue in their deep-seated devotion and allegiance to Soviet Russia, a devotion which has caused them to choose martyrdom and to keep their lips sealed.

The defendants, still defiant, assert that they seek justice not mercy. What they seek they have attained. Despite this, I must nevertheless consider whether they are deserving of mercy. While I am deeply moved by considerations of parenthood and while I find death in any form heartrending, I have a responsibility to mete out justice in a manner dictated by the statutes and the interests of our country. My personal feelings or preferences must be pushed aside for my prime obligation is to society and to American institutions. The families of these defendants are victims of their infamy but I am mindful that countless other Americans may also be victims of that infamy. The defendants were not moved by any consideration for their families and their children in committing their crimes, but have urged such consideration upon the Court, in order to make more difficult an already trying task. In considering mercy I am reminded of this passage from Mary Ann Evans' (George Eliot), Romola, III, 1863,

"There is a mercy which is weakness, and even treason against the common good."

6. The evidence in May's case showed that he transmitted information on atomic research calculators. May's counsel emphasized, at the time of his sentencing, that he had not worked on the atomic bomb itself. Unlike the Rosenbergs, he was not a participant in a general conspiracy to furnish security information to Russia on all phases of military preparations.

I am advised that the English court stated, upon sentencing Fuchs:

"The maximum sentence I can give you under the Official Secrets Act is 14 years, and I therefore give you 14 years."

Mr. Justice Cardozo pointed out in Snyder v. Commonwealth of Massachusetts, 1933, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674:

> "But justice, though due to the accused, is due to the accuser also."

██ Penologists and Judges may differ as to whether capital punishment can serve as a deterrent. Underlying the provision for capital punishment in espionage and treason acts is the tenet that forfeiture of the life of the spy or traitor will serve as an example to those who may thereafter be tempted to commit similar acts. This is vital in the world in which we live, infiltrated as we are by the home grown and foreign variety of spies, which are and will be a continuing threat to our security so long as a foreign nation provides incentive for this spying. On this score, I believe my words at the sentencing are still appropriate;

> "Our national security is more important than any personal feelings that I might have on the subject and it is more important, I think, than the punishment of any single individual." (Record, p. 2493).

I recognize that some forces are attempting to use this case to fan anti-American fires. This is an unfortunate by-product of the case. The passing of time and the blurring of the memory of men permits the true evidence established at the trial to become beclouded by propaganda. But, I repeat, the guilt of the defendants was established by overwhelming direct evidence which the jury found credible, and indeed it is my belief that their guilt was established beyond any doubt.

██ I have not considered the international consequences of the Soviet propaganda concerning these sentences. It is entirely possible that their false characterizations of this trial and the sentences of this Court might supply grist to their mills dedicated to the poisoning of the minds of the peoples of the world.

This Court is not equipped to appraise the effectiveness of such propaganda upon our foreign relations nor, in my opinion, is this a matter for the judiciary to consider. It may be that such questions merit careful consideration but they are properly addressed to the Executive Department.

The President is vested with the power to speak and listen as the representative of this nation. He is also vested with power to grant reprieves and pardons for offenses against the United States. U. S. Constitution Article II, Section 2, Clause 1.

Mr. Justice Holmes in Biddle v. Perovich, 1926, 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161, pointed out that executive clemency was not a private act of Congress; it was a part of the Constitutional scheme, and when it was granted, it was the determination of the ultimate authority that the public welfare (and this included international as well as national situations) will be better served by inflicting less than the judgment fixed.

So, we observe, that it is over one year and nine months since this Court discharged the unpleasant duty of sentencing these defendants. During that time their appeal has been carried from this Court through all the appropriate Appellate Courts and the sentence and judgment have not been disturbed. No legal recourse has been denied the defendants. I have already pointed out that I withdrew from hearing a motion so that another Judge, not previously involved in this case, might rule on this motion to set aside the judgment of conviction. Through all of this no other court has been able to find a reversible error or the legal justification to set aside the sentence. Now, because our judicial procedures provide that the case may go back to the original court, for consideration upon a motion to reduce the sentence, I have been once again faced with the unpleasant task of reviewing the crime and sentence of these defendants.

██ I have meditated and reflected long and difficult hours over the sentence in this case. I have studied and re-studied the record and I have seen nothing nor has anything been presented to me to cause me to change the sentence originally imposed. I still feel that their crime was worse than murder. Nor have I seen any evidence that the defendants have experienced any remorse or repentance. Unfortunately, in its

place this Court has been subjected to a mounting organized campaign of vilification, abuse and pressure. This Court, however, is not subject to such organized campaign and the pressures which have been brought to bear in this case, nor does it require such tactics to make it cognizant of the human tragedy involved.

The application is denied.