**F. & A. ICE CREAM CO. v. ARDEN FARMS CO. et al.**

**No. 12406–BH.**

United States District Court,
S. D. California, Central Division.

June 4, 1951.

182

Sheppard, Mullin, Richter & Balthis and Gordon F. Hampton, all of Los Angeles, Cal., for plaintiff.

Cosgrove, Cramer, Diether & Rindge, T. B. Cosgrove, J. D. Barnum, Jr., Morrow & Morrow, John C. Morrow, Gibson, Dunn & Crutcher, Henry F. Prince, and Julian O. von Kalinowski, all of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

Pending before the Court in the foregoing and related cases are the following motions:

1. Motion filed March 15, 1951, by all defendants (other than Roy E. Campbell and A-1 Ice Cream Company) to dismiss the 4th, 5th and 6th causes of action in Cases Nos. 12,744–WB and 12,776–WB.

2. Motion of defendant Roy E. Campbell only, filed March 16, 1951, to dismiss the 5th and 6th causes in Cases Nos. 12,434–Y and 12,524–BH; and to dismiss the 4th and 5th causes in all the remaining cases.

The Complaints in these cases, and especially in the causes of action under the Robinson-Patman Act to which these motions relate, are outlined in the Opinion filed in Balian Ice Cream Co., Inc. v. Arden Farms Co., et al.[1]

There we determined that the Robinson-Patman Act[2] was an anti-trust law[3] so as to permit a person injured by its violation to institute an action for three-fold damages.[4]

The new grounds urged for a contrary ruling by some of the defendants who have not previously appeared have been considered. And we are satisfied with the correctness of the determination of these questions already made.

■ For the first time, however, both the defendants who have already appeared, and others, challenge the constitutionality of Section 3 of the Act.[5] While the attack is directed at the entire section, we cannot entertain so broad a challenge. The causes of action under the Robinson-Patman Act with which we are concerned (Count 4 in 12744–WB and the similar counts in the other cases), are brought under the clause which prohibits the sale of goods "at unreasonably low prices for the purpose of destroying competition or eliminating a competitor". So our consideration of constitutionality must be limited to this clause. For it is not the province of courts to make abstract or theoretical declarations on the constitutionality of statutes or portions of statutes not before them.[6]

I

The Power to Regulate Commerce

■ Another limitation stems from the fact that the Robinson-Patman Act was enacted under the broad power of the Congress "to prescribe the rule by which commerce is to be governed."[7]

■ In exercising this power, the Congress has few limitations. Mr. Justice Stone has stated the boundless nature of it in these words:

"The power 'is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution.' Gibbons

1. Balian Ice Cream Co., Inc. v. Arden Farms Co., D.C.Calif., 1951, 94 F.Supp. 796.
2. 15 U.S.C.A. §§ 13, 13a, 13b, 21a.
3. 15 U.S.C.A. § 12.
4. 15 U.S.C.A. § 15.
5. 15 U.S.C.A. § 13a.
6. White v. Johnson, 1931, 282 U.S. 367–373, 51 S.Ct. 115, 75 L.Ed. 388; Bandini Petroleum Company v. Superior Court, 1931, 284 U.S. 8, 22, 52 S.Ct. 103, 76 L.Ed. 136. Only a litigant who is injuriously affected by a statute can challenge its validity. Frank L. Young Company v. McNeal-Edwards Co., 1931, 283 U.S. 398, 400, 51 S.Ct. 538, 75 L.Ed. 1140; Voeller v. Neilston Warehouse Co., 1940, 311 U.S. 531, 537, 61 S.Ct. 376, 85 L.Ed. 322; Coffman v. Breeze Corp., Inc., 1945, 323 U.S. 316, 325–326, 65 S.Ct. 298, 89 L.Ed. 264. *And the defendants here can only be injuriously affected by the portions of the statute under which a cause of action against them is grounded.*
7. Gibbons v. Ogden, 1824, 9 Wheat. 1, 196, 6 L.Ed. 23.

v. Ogden, supra, 9 Wheat. 1, 196, 6 L.Ed. 23. Hence Congress is free to exclude from interstate commerce articles whose use in the states for which they are destined it may reasonably conceive to be injurious to the public health, morals, or welfare, Reid v. Colorado, supra [187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108]; Lottery Case [Champion v. Ames], supra [188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492]; Hipolite Egg Co. v. United States, 220 U.S. 45, 31 S.Ct. 364, 55 L.Ed. 364; Hoke v. United States, supra [227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523], or which contravene the policy of the state of their destination, Kentucky Whip & Collar Co. v. Illinois Central R. Co., 299 U.S. 334 [335], 57 S.Ct. 277, 81 L.Ed. 270. Such regulation is not a forbidden invasion of state power either because its motive or its consequence is to restrict the use of articles of commerce within the states of destination, and is not prohibited unless by the due process clause of the Fifth Amendment. And it is no objection to the exertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states." [8]

The limitations which ordinarily apply to legislative restrictions or prohibitions relating to contracts, and especially the due process clause of the Fifth Amendment, do not stand in the way of the exercise of this power. In Addyston Pipe & Steel Co. v. United States [9], the Court said:

"In Gibbons v. Ogden (supra), the power was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution.

"Under this grant of power to Congress, that body, in our judgment, may enact such legislation as shall declare void and prohibit the performance of any contract between individuals or corporations where the natural and direct effect of such a contract will be, when carried out, to directly, and not as a mere incident to other and innocent purposes, regulate to any substantial extent interstate commerce. * * * We do not assent to the correctness of the proposition that the constitutional guaranty of liberty to the individual to enter into private contracts limits the power of Congress and prevents it from legislating upon the subject of contracts of the class mentioned."

Indeed, it has been intimated that the due process limitation of the Fifth Amendment *does not* apply to legislation under the commerce clause.[10] This is, perhaps, too broad a statement. For the limitation of due process *does* apply to legislation under the commerce clause.[11] What is meant, however, is this: The power to exclude from interstate commerce being practically unlimited,[12] the norms by which it is determined whether due process has been violated are entirely different. For what may be entirely prohibited may be regulated almost limitlessly.[13] And legislative prohibitions which would violate due process if unrelated to commerce, fulfill the standard when they concern interstate commerce. So we come to the specific problem.

8. United States v. Carolene Products Co., 1938, 304 U.S. 144, 147, 58 S.Ct. 778, 781, 82 L.Ed. 1234. And see, North American Co. v. Securities & Exchange Commission, 1946, 327 U.S. 686, 705–706, 66 S.Ct. 785, 90 L.Ed. 945.

9. Addyston Pipe & Steel Co. v. United States, 1899, 175 U.S. 211, 228, 20 S.Ct. 96, 102, 44 L.Ed. 136.

10. See, Great Atlantic & Steel Co. v. Federal Trade Commission, 3 Cir., 1939, 106 F.2d 667, 678.

11. United States v. Carolene Products Co., 1938, 304 U.S. 144, 147, 58 S.Ct. 778, 82 L.Ed. 1234.

12. National Labor Relations Board v. Jones & Laughlin Corp., 1947, 301 U.S. 1, 36–37, 57 S.Ct. 615, 81 L.Ed. 893; United States v. South-Eastern Underwriters' Ass'n, 1944, 322 U.S. 533, 558–559, 64 S.Ct. 1162, 88 L.Ed. 1440.

13. Mulford v. Smith, 1939, 307 U.S. 38, 48, 59 S.Ct. 648, 83 L.Ed. 1092; Prudential Insurance Co. v. Benjamin, 1946, 328 U.S. 408, 423–424, 66 S.Ct. 1142, 90 L.Ed. 1342; Cleveland v. United States, 1946, 329 U.S. 14, 19, 67 S.Ct. 13, 91 L. Ed. 12. And see the writer's opinion in United States v. Edwards, D.C.Cal., 1926, 14 F.Supp. 384, 388–391.

## II

### Certainty in Criminal Statutes

■ The first ground for attack on the clause under discussion is that it does not satisfy the test of definiteness required in a statute of this character. A criminal statute must be definite. The reason for this requirement has been stated by the Supreme Court:

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids. The applicable rule is stated in Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322; 'That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' " [14]

■ It is one of the requirements of due process that a statute making certain conduct criminal should designate with certainty and definiteness the act which it proscribes.[15] This, in turn, stems from the fundamental principle in our law expressed in the Latin maxim, *Nullum crimen, nulla poena sine lege.* (No crime or punishment without law.) In effect, this means that no one shall be held criminally responsible for conduct which is not specifically forbidden by a statute. And a statute is definite when it "provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer".[16]

It is argued that the clause under consideration does not meet this requirement, because no objective criterion exists by which to determine whether, in a specific instance, the price at which goods are sold is "unreasonably low."

## III

### "Reasonableness" as a Test

■ The standard of reasonableness as applied to conduct is an old one and long accepted in our law. It is based on the assumption that the actions of the reasonable, average person may be used as a standard by which to measure conduct,—whether it relates to care or absence of it, skill or other similar circumstances to which the test is applied.[17] While it attempts to measure the subjective reaction of the assumed reasonable person in certain circumstances, the test is "external and objective." [18]

But whether we consider it subjective or objective,[19] it uses, as the standard, the

14. Lanzetta v. State of New Jersey, 1939, 306 U.S. 451, 454, 59 S.Ct. 618, 619, 83 L.Ed. 888. For earlier enunciations of the same principles, see, International Harvester Co. of America v. Commonwealth of Kentucky, 1914, 234 U.S. 216, 222–224, 34 S.Ct. 853, 58 L.Ed. 1284; Collins v. Commonwealth of Kentucky, 1914, 234 U.S. 634, 637–638, 34 S.Ct. 924, 58 L.Ed. 1510; Connally v. General Construction Co., 1926, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322. And for the latest declaration on the subject, see, Jordan v. De George, 1951, 341 U.S. 223, 71 S.Ct. 703.

15. Note, Due Process Requirements of Definiteness in Statutes, 1948, 62 Harvard Law Review, p. 77. And see cases cited in Note 14, supra.

16. United States v. Petrillo, 1947, 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877. And see, Winters v. People of State of New York, 1948, 333 U.S. 507, 517–518, 68 S.Ct. 665, 92 L.Ed. 840; Musser v. State of Utah, 1948, 333 U.S. 95, 97, 68 S.Ct. 397, 92 L.Ed. 562.

17. See the writer's opinion in People v. Curtiss, 1931, 116 Cal.App.Supp., 771, 781, 300 P. 801.

18. Benjamin N. Cardozo, The Paradoxes of Legal Science, 1928, p. 74.

19. Even writers who consider the test subjective do so merely because they believe that conduct cannot be dissociated from certain attributes,—physical or mental, of the actor, as gauged by the standard knowledge and average mental quali-

action of "the man who conforms to the common standards of society." [20] So reasonableness or unreasonableness has been recognized as consonant with due process under a great variety of circumstances other than those relating to care and negligence. Illustrative are: Cases sustaining such standards when applied to speed of motor vehicles[21], rates or fees to be charged for services,[22] and deductions to be made from income taxes.[23] In the realm of economic controls, a state statute which prohibited contracts "reasonably calculated" or which "tend" to fix prices has been upheld.[24]

A provision of the Federal Food and Drug Act, 21 U.S.C.A. § 1 et seq., which permitted "reasonable variations" in weights or measures to be established by departmental rule was sustained against the attack of indefiniteness and delegation of legislative power.[25] The same conclusion was reached as to a state statute, Rev. Codes Idaho, § 6872, relating to "any cattle range previously * * * or * * * usually occupied by any cattle grower".[26] Even in the realm of freedom of expression, where courts are more likely to resist legislative intrusion, a municipal ordinance which forbade the use or operation on public streets of sound trucks or of any instrument which emitted "loud and raucous noises" was sustained.[27]

So it is apparent that the test of reasonableness or unreasonableness or similar tests which can be judged by reference to a common standard of conduct satisfy the requirement of definiteness.

Of necessity, any test by conduct contains a variable element which may call for different conclusions by different persons under different or *even the same* circumstances. But that in itself has never been considered a fatal vice. Thus, a state statute which required a hotel proprietor, in case of fire, to give notice to all the guests at once, and to "do all in their power to save such guests and inmates" Rev.St.Neb. 1913, § 3104, was sustained, the Court saying: "Rules of conduct must necessarily be expressed in general terms and depend for their application upon circumstances, and circumstances vary. It may be true, as counsel says, that 'men are differently constituted,' some being 'abject cowards, and few only are real heroes;' that the brains of some people work 'rapidly and normally in the face of danger while other people lose all control over their actions.' It is manifest that rules could not be prescribed to meet these varying qualities. Yet all must be brought to judgment. And what better test could be devised than the doing of 'all in one's power' as determined by the circumstances?" [28] And this is especially true when we are dealing with statutes which seek to control economic activities. In Nash v. United

---

ties at the time. See, Warren A. Seavey, Negligence, Subjective or Objective, 1927, 41 Harvard Law Review, 1, 28.

20. Cardozo, Op.Cit., p. 73.

21. Ex parte Daniels, 1920, 183 Cal. 636, 646–647, 192 P. 442, 21 A.L.R. 1172; Miller v. State of Oregon, 1927, 273 U.S. 657, 47 S.Ct. 344, 71 L.Ed. 825. The latter is only a brief memorandum opinion. Its full scope appears in the comment on it in Cline v. Frink Dairy Co., 1927, 274 U.S. 445, at pages 464–465, 47 S.Ct. 681, 71 L.Ed. 1146.

22. Tagg Bros. v. United States, 1930, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524; Kay v. United States, 1927, 303 U.S. 1, 8–9, 58 S.Ct. 468, 82 L.Ed. 607.

23. United States v. Ragen, 1942, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383.

24. Waters-Pierce Oil Co. v. State of Texas, No. 1, 1909, 212 U.S. 86, 109–111, 29 S.Ct. 220, 53 L.Ed. 417.

25. United States v. Shreveport Grain & Elevator Co., 1932, 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175. And see, Union Bridge Co. v. United States, 1907, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523 ("*unreasonable obstructions*" to navigation); Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 398–399, 60 S.Ct. 907, 84 L.Ed. 1263 (fixing *reasonable price for coal*).

26. Omaechevarria v. State of Idaho, 1918, 246 U.S. 343, 345–348, 38 S.Ct. 323, 324, 62 L.Ed. 763.

27. Kovacs v. Cooper, 1949, 336 U.S. 77, 69 S.Ct. 448, 449, 93 L.Ed. 513.

28. Miller v. Strahl, 1915, 239 U.S. 426, 434, 36 S.Ct. 147, 149, 60 L.Ed. 364.

States,[29] the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, was attacked on the ground of vagueness. It was argued that the statute contained, in its definition, an element of degree as to which estimates may differ, and that criminality cannot be made to depend upon *whether a jury may think an act is reasonable or unreasonable.* The Court's answer, through Mr. Justice Oliver Wendell Holmes, has become classic: "But, apart from the common law as to the restraint of trade thus taken up by the statute, the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. 'An act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it' by common experience in the circumstances known to the actor. 'The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw.' Commonwealth v. Pierce, 138 Mass. 165, 178. Commonwealth v. Chance, 174 Mass. 245, 252, 54 N.E. 551. 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' 1 East P.C. 262. If a man should kill another by driving an automobile furiously into a crowd, he might be convicted of murder, however little he expected the result. See Reg. v. Desmond, and other illustrations in Stephen's, Dig. Crim.Law, art. 223, 1st ed., p. 146. If he did no more than drive negligently through a street, he might get off with manslaughter or less. Reg. v. Swindall, 2 C. & K. 230; Rex v. Burton, 1 Strange, 481. And in the last case he might be held although he himself thought that he was acting as a prudent man should." [30]

It is insisted, however, that in some later cases, especially United States v. L. Cohen Grocery Company,[31]—which is the foundation for two later decisions, Cline v. Frink Dairy Company[32] and Fairmont Creamery Company v. State of Minnesota,[33]—the

29. Nash v. United States, 1913, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

30. Nash v. United States, supra, 229 U.S. at page 377, 33 S.Ct. at page 781.

31. United States v. L. Cohen Grocery Company, 1921, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516.

32. Cline v. Frink Dairy Company, 1927, 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146.

33. Fairmont Creamery Co. v. State of Minnesota, 1927, 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893. Unlike the Cohen case, this and the Cline case involved restrictions *unrelated to purpose* as an element of the offense. To illustrate: Prior to the amendment of the Minnesota Act of 1923, M.S.A. § 32.11, which the Court had under consideration in this case, the statute had prohibited discrimination in prices between localities "with the intention of creating a monopoly or destroying the business of a competitor." A later statute forbade discrimination with "the purpose of creating a monopoly, or to restrain trade, or to prevent or limit competition, or to destroy the business of a competitor." The Act under consideration "eliminated purpose as an element of the offense." It was this elimination which led the Court to the conclusion that the standard of certainty was absent, saying: "As the inhibition of the statute applies *irrespective of motive*, we have an obvious attempt to destroy plaintiff in error's liberty to enter into normal contracts, long regarded, not only as essential to the freedom of trade and commerce, but also as beneficial to the public." Fairmont Creamery Co. v. State of Minnesota, supra, 274 U.S. at page 8, 47 S.Ct. at page 508. (Emphasis added.)

Similarly in the Cline case, the Colorado statute there under consideration was declared to be invalid because unreasonableness of price or rate *was not* tied to a purpose. The Court, in distinguishing the situation from that which obtained in the Nash case said: "This review showing what was the standard of criminality in the federal anti-trust law, indicates clearly that the decision in the Cohen Grocery Case was not inconsistent with the Nash Case, because the latter did not relate to the reasonableness or excessiveness of prices charged for necessaries *without more* as a basis for criminality, while the former plainly did." Cline v. Frink Dairy Co., supra, 274 U.S. at page 463, 47 S.Ct. at page 687. (Emphasis added.)

tests of reasonableness or unreasonableness in matters of the character here involved have been rejected. *There is no warrant for such contention.* The Supreme Court, itself, has seen no conflict between these cases. Indeed, they have referred to them repeatedly as presenting different solutions of diverse problems of statutory construction.[34]

The chief vice of the statute considered in the Cohen case lay in the fact that it *forbade no specific act* whether done willfully or not. The statute was the Lever Act of 1919, which provided "That it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries".[35]

In subsequent cases, the Supreme Court has stated that such prohibitions are inadequate compliance with the requirement of definiteness in a criminal statute only *if they are unrelated to the intent or purpose other than the doing of the act itself. But where the specific act denounced is tied to a specific intent to achieve a certain result, certainty is present.*

So, when the Court was dealing with a prosecution under the Espionage Act of 1917,[3] which prohibited obtaining and delivering information with intent or reason to believe that the information is to be used to the injury of the United States, the Court had no difficulty in distinguishing its prior cases and holding that the norm of definiteness had been satisfied, saying: "But we find no uncertainty in this statute which deprives a person of the ability to predetermine whether a contemplated ac-

tion is criminal under the provisions of this law. The obvious delimiting words in the statute are those requiring 'intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation.' This requires those prosecuted to have acted in bad faith. The sanctions apply only when *scienter* is established." [37]

In a later case, the Court, in interpreting the Civil Rights Statute,[38] applied the same norm. In the opinion of Mr. Justice Douglas, the following language is found: "The Court, indeed, has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. The constitutional vice in such a statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning. See United States v. L. Cohen Grocery Co., supra. *But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law. The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."* [39] (Emphasis added.)

---

Where, however, as will appear further on in the discussion, a statute embodies as an element willful design or purpose to achieve a certain result through the fixing of prices or rates the *quantum* of certainty is present.

34. Gorin v. United States, 1941, 312 U.S. 19, 26–28, 61 S.Ct. 429, 85 L.Ed. 488; and Note 13 to text, p. 27.

35. Act of October 22, 1919, c. 80, 41 Stat. 297.

36. Act of June 15, 1917, c. 30, Title 1, 40 Stat. 217, 18 U.S.C.A. § 794(a).

37. Gorin v. United States, 1941, 312 U.S. 19, 27, 61 S.Ct. 429, 433, 85 L.Ed. 488.

38. Federal Criminal Code, Sec. 20, 18 U. S.C.A., § 242.

39. Screws v. United States, 1945, 325 U.S. 91, 101–102, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495. Further on in the opinion, Mr. Justice Douglas says: "The constitutional requirement that a criminal statute be definite serves a high function. It gives a person acting with reference to the statute fair warning that his conduct is within its prohibition. This requirement is met when a statute prohibits only 'willful' acts in the sense we have explained. One who does act with such specific intent is aware that what he does is precisely that which the statute for-

The Court reaffirmed this doctrine in a case which arose under the Communications Act.[40] The Court was considering a provision of that Act[41] which made it a crime, by force, violence or intimidation, to compel a Radio broadcast licensee to employ or agree to employ in connection with the conduct of his business, any person or persons "in excess of the number of employees needed by such licensee to perform actual services". To the contention that there was no test by which to determine whether the employees *were needed,* the Court gave this answer: "We think that the language Congress used provides an adequate warning as to what conduct falls under its ban, and marks boundaries sufficiently distinct for judges and juries fairly to administer the law in accordance with the will of Congress. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. Robinson v. United States, 324 U.S. 282, 285, 286, 65 S.Ct. 666, 668, 669, 89 L.Ed. 944. It would strain the requirement for certainty in

criminal law standards too near the breaking point to say that it was impossible judicially to determine whether a person knew when he was wilfully attempting to compel another to hire unneeded employees. See Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495; United States v. Ragen, 314 U.S. 513, 522, 524, 525, 62 S.Ct. 374, 377, 378, 379, 86 L.Ed. 383. The Constitution has erected procedural safeguards to protect against conviction for crime except for violation of laws which have clearly defined conduct thereafter to be punished; but the Constitution does not require impossible standards. The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more."[42]

## IV

## "Unreasonably Low" as a Valid Standard

The principle thus discussed calls for application with greater force to a statute like the Robinson-Patman Act because it is enacted under the almost unlimited power of the Congress to regulate commerce.[43]

---

bids. He is under no necessity of guessing whether the statute applies to him (see Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L. Ed. 322) for he either knows or acts in reckless disregard of its prohibition of the deprivation of a defined constitutional or other federal right. See Gorin v. United States, 312 U.S. 19, 27, 28, 61 S.Ct. 429, 433, 434, 85 L.Ed. 488. Nor is such an act beyond the understanding and comprehension of juries summoned to pass on them. The Act would then not become a trap for law enforcement agencies acting in good faith. 'A mind intent upon willful evasion is inconsistent with surprised innocence.' United States v. Ragen, supra, 314 U.S. at page 524, 62 S.Ct. [374] at page 379, 86 L.Ed. 383." 325 U.S. at pages 103–104, 65 S.Ct. at page 1036.

Neither in the concurring opinion of Mr. Justice Rutledge nor in the dissenting opinion of Mr. Justice Murphy is there dissent expressed from these views. Indeed, Mr. Justice Rutledge disposes very briefly of the contention of vagueness by referring to the Sherman Act as an illustration of a general statute which has stood the test. See 325 U.S. at page 129

of opinion and Footnote 31, 65 S.Ct. 1031, in which many cases are referred to, including Gorin v. United States, supra. This is also implicit in the rulings in the Fairmont and Cline cases, as appears from the comments on them in *Note 33,* supra.

The recent decisions of the Supreme Court in United States v. Williams, 1951, 341 U.S. 70, 71 S.Ct. 581; Id., 341 U.S. 58, 71 S.Ct. 595, reaffirm this view of Section 20 of the Federal Criminal Code, 18 U.S.C.A. § 242.

40. 48 Stat. 1064, 60 Stat. 89, 47 U.S.C.A. § 151 et seq.

41. Section 506(a) (1), 47 U.S.C.A. § 506 (a) (1).

42. United States v. Petrillo, 1947, 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877.

43. United States Constitution, Article I, Sec. 8, Clause 3. And see, National Labor Relations Board v. Jones & Laughlin Steel Corp., 1947, 301 U.S. 1, 36–37, 57 S.Ct. 615, 81 L.Ed. 893; United States v. South-Eastern Underwriters' Ass'n, 1944, 322 U.S. 558–559, 64 S.Ct. 1162, 88 L. Ed. 1440. And cases cited in Notes 8–12 supra.

In interpreting it, we must bear this object in mind. When we do, difficulties which might be present in dealing with an ordinary statute evaporate. For the specific object of the anti-trust laws is to make ours "a competitive business economy".[44] And when the Congress, in seeking to achieve this aim through the Robinson-Patman Act, makes it illegal (1) to sell or contract to sell goods at unreasonably low prices, (2) for the purpose of destroying competition or eliminating a competitor, it denounces an act, the illegality of which depends upon (1) a finding of unreasonableness, and (2) the design and purpose to destroy competition by it.

So the Congress has complied with all the recognized elements by which definiteness is gauged. And the enforcement of such statute presents no greater difficulties than those which are likely to arise under the similar statutes already alluded to. Cost accountancy has reached the exactness of a science. Courts have recognized the elements which go into establishing cost, which is one of the basic facts by which price must be determined.[45] Whether a price is high or low, and if so, whether it is unreasonably so, can be determined by ordinary business and accountancy methods which take into consideration cost, market, usual profits and other elements. The unreasonably low price which the statute considers an evil would rarely, if ever, be an *initial* price, except in the rare instance where it would relate to a product not previously marketed. In most instances, it would involve a sudden

44. United States v. South-Eastern Underwriters' Ass'n, supra, 322 U.S. at page 559, 64 S.Ct. at page 1177. In pursuit of that object, based on the theory that a competitive economy is beneficial to the American people, it eschews practices which have come to be designated popularly as "cut-throat" when they are used as a means of achieving monopoly through destruction or elimination of competition by low prices. In fact, a study of the anti-trust and related monopoly cases discloses the fact that low prices, unsound from an economic and every other standpoint, have been a means of monopolization, as have also discriminatory prices.

See, Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 70–78, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 1911, 221 U.S. 106, 181–184, 31 S.Ct. 632, 55 L.Ed. 663; Porto Rican American Tobacco Co. of Porto Rico v. American Tobacco Co., 2 Cir., 1929, 30 F.2d 234; E. B. Muller & Co. v. Federal Trade Commission, 6 Cir., 1944, 142 F.2d 511, 516–518; Standard Oil Co. v. Federal Trade Commission, 1951, 340 U.S. 231, 248–250, 71 S.Ct. 240; and see, William Simon, Price Discrimination to Meet Competition, 1950, The U. of Ill. Law Forum, No. 4, pp. 575, 577–590.

So the clause under discussion is an embodiment of this policy of opposition to this practice. It should be added that English law permits rival manufacturers to protect themselves against "cut-throat" methods of competition. See, Walter H. Hamilton, Competition, 4 Ency. Social Sciences, 1937, pp. 141–147; Myron Watkins, Price Discrimination, 12 Ency. Social Sciences, p. 350; Attorney General v. Adelaide S. S. Co., [1913] A.C. 781. Senator John Sherman, the author of the first anti-trust act, claimed that "it aimed only at unlawful combinations", and that it did not affect "combinations in aid of production where there is free and fair competition." See, Ida M. Tabell, The Nationalizing of Business, 1936, (A History of American Life, IX), pp. 203–215; Harold V. Faulkner, 1931, The Quest for Social Justice (A History of American Life, XI), pp. 110–129; Harold V. Faulkner, 1929, American Economic History, pp. 533–545; Arthur M. Schlesinger, 1928, Political and Social History of the United States, pp. 367–373. Thus, the prohibition of unreasonable price-cutting serves to maintain competition "free and fair". Or, at least, that is what those behind the anti-trust laws think. And our function is to give effect to this thought if legislatively expressed within constitutional bounds.

Greater significance attaches to the attempt to reach such practices through federal legislation because of the recent decision of the Supreme Court invalidating state fair trade acts. See, Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 71 S.Ct. 745.

45. Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 1950, 178 F.2d 541, 556–558. "The fixing of prices, *the proscription of unfair trade practices* * * * *constitute regulations within the competence of Congress under the commerce clause.*" Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 393, 60 S.Ct. 907, 912, 84 L.Ed. 1263. (Emphasis added.)

and unexpected change of price in a staple article of commerce by one engaged in a competitive field. So, in determining its character, and whether it was put into effect as a means of destroying competition, additional elements other than those already mentioned, such as cost, usual profits and the like, would be available for consideration. Among them might be mentioned the suddenness of the price change, its relation to previous prices charged by the merchant or by others in the field in the particular locality or elsewhere, the existence or non-existence of new economic factors relating to cost of production, demand for the article, seasonal or other, the consequent need for expansion or contraction of the field for the particular merchandise and other factors, financial or economic, which might or might not warrant a precipitate reduction in price. And on the basis of such factors, it would be possible to submit to a jury for its determination the question whether (1) the price is unreasonably low, and (2) whether it was so fixed for the purpose of destroying competition. This is certainly no more difficult to determine than whether the punishment of a child by a teacher was "unjustifiable";[46] whether the number of employees which the operator of a radio station was compelled to use exceeded what was "needed";[47] whether a deducted business expense was "reasonable" for income tax purposes;[48] whether an automobile was traveling at a "dangerous" rate of speed;[49] whether contracts are "reasonably calculated" or "tend" to fix prices;[50] or whether an obstruction to navigation is "unreasonable".[51] And when the courts could see no unwarranted delegation of legislative power to juries in any of these statutes, we can see none here.

 It follows that the attack on the constitutionality of the Clause of Section 3 of the Robinson-Patman Act under discussion must fail. Nor is there any merit to the contention made by some of the defendants in moving for the dismissal of Counts 5 and 6 of Case No. 12744–WB, and similar counts in the other cases, that the California anti-trust statute on which these counts are based,—the Cartwright Act,—[52] is unconstitutional. Some years ago, I held the statute unconstitutional because of the 1909 amendment which exempted certain combinations from the operation of the statute, and thus introduced an element of uncertainty into the entire statute.[53] Since that time, however, the Supreme Court of California, while holding that the particular amendment was unconstitutional, has ruled that the clause was separable and did not affect the validity of the remainder.[54] This adjudication is binding on us. For separability of a clause in a state statute is determined by state law.[55]

46. People v. Curtiss, 1931, 116 Cal.App. Supp. 771, 300 P. 801.

47. United States v. Petrillo, 1947, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877.

48. United States v. Ragen, 1942, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383.

49. Miller v. State of Oregon, 1927, 273 U.S. 657, 47 S.Ct. 344, 71 L.Ed. 825. For comment on the import of the ruling in this case, see, Cline v. Frink Dairy Company, 1927, 274 U.S. 445, at pages 464–465, 47 S.Ct. 681, 71 L.Ed. 1146.

50. Waters-Pierce Oil Co. v. State of Texas (No. 1), 1909, 212 U.S. 86, 29 S.Ct. 220, 53 L.Ed. 417.

51. Union Bridge Co. v. United States, 1907, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523.

52. California Business & Professions Code, Sec. 16600–16758. Section 16701 provides a special separability clause for this statute.

53. Blake v. Paramount Pictures, D.C.Cal., 1938, 22 F.Supp. 249.

54. Speegle v. Board of Fire Underwriters of the Pacific, 1946, 29 Cal.2d 34, 46–51, 172 P.2d 867; and see, Frost v. Corporation Commissioner of Oklahoma, 1929, 278 U.S. 515, 526–527, 49 S.Ct. 235, 73 L.Ed. 483; Kay v. United States, 1938, 303 U.S. 1, 6, 58 S.Ct. 468, 82 L.Ed. 607.

55. Dorchy v. State of Kansas, 1924, 264 U.S. 286, 290–291, 44 S.Ct. 323, 68 L.Ed. 686; Schneider Granite Co. v. Gast Realty & Investment Co., 1917, 245 U.S. 288, 290–291, 38 S.Ct. 125, 62 L.Ed. 292; Skinner v. State of Oklahoma ex rel. Williamson, 1941, 316 U.S. 535, 543, 62 S.Ct. 1110, 86 L.Ed. 1655.

More, I am in complete accord with the California court's determination of the question of constitutionality on both state and federal constitutional grounds.

The motions to dismiss are, therefore, denied.