**UNITED STATES v. ROSENBERG et al.**

United States District Court
S. D. New York.

Dec. 10, 1952.

Myles J. Lane, U. S. Atty., New York
City, James B. Kilsheimer III, and Robert
Martin, Asst. U. S. Atty., New York City,
for the Government.

Emanuel M. Bloom, Cleveland, Ohio, for
Julius Rosenberg and Ethel Rosenberg.

Howard N. Meyer, New York City, Har-
old M. Phillips and Edward Kuntz, New
York City, for Morton Sobell.

RYAN, District Judge.

Petitions under Section 2255, Title 28
U.S.C.A., have been filed by Julius Rosen-
berg, Ethel Rosenberg and Morton Sobell
praying for an order vacating and setting
aside judgments of conviction and sentenc-
es imposed upon them on April 5, 1951 after
a jury trial at which one of my brothers in
this District Court presided as the trial
judge. He, for reasons which he has placed
upon the record, has disqualified himself
from hearing these petitions and they have
come on to be heard before me on assign-
ment from the Chief District Judge. Peti-
tioners seek in the alternative a hearing on
the petitions "to determine the issues and
make findings of fact and conclusions of
law, and upon such findings and conclu-
sions, vacating and setting aside the respec-
tive sentences of the petitioners and dis-
charging them from detention and imprison-
ment."

I find no relevant or material issue of
fact raised by the petitions, which requires
a hearing thereon or which renders the tak-
ing of oral testimony either necessary or

helpful. I have concluded, after affording the attorneys for petitioners full opportunity to argue the legal problems presented by the petitions and to make proffers of proof, that the petitioners are entitled to no relief, that the court which rendered judgment had jurisdiction, that the sentences imposed were authorized by law and are not otherwise open to collateral attack on any of the grounds urged by the petitioners[1], and that full and complete enjoyment of the constitutional rights of petitioners has been extended them and has in no way been denied or infringed.

These petitions were filed twenty months after the verdict of guilty was returned by the jury, following a trial which petitioners' attorneys stated "had been conducted * * * with that dignity and that decorum that befits an American trial" (R.1453),[2] and that defense counsel had been afforded "every privilege that a lawyer should expect in a criminal case".

The trial record reveals a defense intelligently conducted by able counsel of petitioners' own choice and selection. The verdict of the jury has now been challenged, although when it was returned the attorney for petitioners Rosenberg stated that from the length of time the jury had taken in their deliberations, as well as from the questions they had asked during the course of their deliberations, he was satisfied that the jury had examined the evidence very carefully. (R.1583).

I. Summary of Points Relied on by petitioners, Julius Rosenberg and Ethel Rosenberg as prepared and submitted by their attorneys.

1. Pre-trial and trial publicity, bearing on the issues of the petitioners' case, adversely reflected upon their innocence, pre-conditioned the public mind in the Southern District of New York to an acceptance of their guilt, and created a trial atmosphere of prejudice and hostility toward them, through:

(a) Newspaper publicity developed by the independent initiative and private enterprise of the newspapers and other mass media of communication circulated within the Southern District of New York;

(b) Information, indicating the guilt of the petitioners "fed to" the press and other mass media of communication circulated within the City of New York by the Federal Bureau of Investigation, the Department of Justice, the office of the United States Attorney for the Southern District of New York, and other officials of Government, and reported widely by the said media of publicity;

(c) The indictment of one, William Perl, procured by the prosecuting authorities in the Southern District of New York in the course of the trial and before the verdict of the petitioners, having the effect of prejudicing the minds of the jurors sitting in the petitioners' cause against the petitioners.

2. The prosecuting authorities knowingly used false testimony to bring about petitioners' conviction.

(a) Alleged cooperation of David Greenglass, main Government witness, with authorities;

(b) Alleged coaching of Greenglass on main elements of case, namely, the subject of alleged transfer.

(c) Schneider testimony

3. The sentencing court was without jurisdiction to impose the sentence: in that the material allegedly transferred and communicated, the gravamen of the offense, was arbitrarily and capriciously classified as "secret", when in fact it was lawfully, widely and publicly known, and its transmittal or communication, therefore, not violative of Sections 32 (a) and 34 of Title 50 U.S.C.A.*

Summary of Points Relied on by petitioner, Morton Sobell, as prepared and submitted by his attorneys.

(a) Abuse of process of Court by Perl indictment plus press statements made in connection with it.

(b) Creation of hostile pretrial atmosphere to Sobell by knowingly false allusions to him as "atom spy" and "member of Klaus Fuchs' spy ring".

(c) Feeding prejudicial material to press, to deprive all defendants of presumption of innocence.

(a. to c. also to be considered together as one point).

(d) Violation of treason clause by use of "treachery and general intent to betray".

(e) Knowing use of false testimony (from Rosenberg petition).

(f) Arbitrary classification of information as secret (from Rosenberg petition).

* 1948 Revised Criminal Code, 18 U.S.C.A. §§ 794, 2388.

2. "R" denotes record on petitions to the Supreme Court for certiorari.

Since the petitioners were sentenced, they have had the benefit of an appeal to the Court of Appeals, 2 Cir., 195 F.2d 583, a petition for rehearing of that appeal, a petition to the Supreme Court for a writ of certiorari, 73 S.Ct. 20, and a further petition to the Supreme Court seeking a rehearing, 73 S.Ct. 134. I have annexed, as an Appendix, a schedule showing in detail the points and objections the petitioners have heretofore urged on the various appeals and petitions they have filed. These appeals and proceedings operate to buttress the presumption of regularity and of due process attending judgments of conviction, especially in the complete absence of creditable evidence to the contrary.[3]

I have considered each ground urged by petitioners as the basis for the granting of the relief they now seek.

Petitioners complain of the pre-trial and trial publicity and argue in substance that it so adversely reflected on their innocence and created a trial atmosphere of such prejudice and hostility toward them as to make impossible the selection of an impartial jury and the conduct of a fair trial. They object to the "newspaper publicity developed by the independent initiative and private enterprise of the newspapers" and say it contributed to a situation by which they were denied the essential requirement of fair play and of justice—a trial by an impartial jury.

We enjoy a free press; neither the policies nor writings of the press may be censored or dictated by the state or government agencies. "Jurors cannot be treated as unable to withstand any effect of newspaper publications. Indeed such a ruling would make it practically impossible to conduct trials in metropolitan centers and would treat the average sceptical juror as a helpless person."[4]

Newspapers, unquestionably in response to popular demand, feature with large headlines and considerable space reports of investigations of corruption, crime, vice and espionage activities. The trials of those charged with these offenses have been made "sensational" and have been the source of what is well-nigh universally considered by the newspapers as "good copy." I need not here consider the wisdom of attempts at judicial curtailment of such publications, or the dangers to our constitutional guaranties of freedom of speech and press which would flow in the wake of unwarranted judicial restrictions on free expression.

A reading of the newspaper articles submitted by petitioners reveals nothing of an unusual or inflammatory character. The articles seem but a fair response to a legitimate public interest in a matter of vital concern to all—the atom bomb and atomic energy and the hope for its employment for the benefit and not the destruction of mankind. The accounts of the arrests and subsequent indictments of petitioners tended to allay a public anxiety and to give assurance that those charged with the protection of vital information were alert and diligent in the performance of their obligations.

When these publications are measured against the field in which they were circulated their effect upon the general public is seen as negligible.[5] There was no unseemly rush to bring the petitioners to trial. Julius Rosenberg was arrested on July 17, 1950; Ethel Rosenberg on August 11, 1950 and Morton Sobell on August 18, 1950. The trial began on March 6, 1951, shortly less than seven months after the arrest of Sobell, the last defendant to be taken into custody. Any public prejudice which might be ascribed to newspaper publicity incident to the arrest of these defendants had long

3. Canizio v. People of State of New York, 1946, 327 U.S. 82–84, 66 S.Ct. 452, 90 L. Ed. 545.

4. United States v. Keegan, 2 Cir., 1944, 141 F.2d 248, 258.

5. "The effect of inflammatory reporting in large metropolitan communities, where it is most likely to occur, is especially open to question. The daily sensations that are repeated to a sophisticated population are seldom remembered, nor are they effective in shaping attitudes. Given large jury lists and the lack of homogeneity of these communities, it should always be possible to find twelve persons whose minds have not been poisoned by pre-trial sensationalism." Yale Law Journal, Vol. 59, No. 3, p. 543, Feb. 1950.

since been dissipated among the populace of the area from which talesmen were drawn—an area where occurrences no matter how sensational lose their news value and no longer attract public interest after a much shorter space of time than seven months.

When the indictment was called for trial no application was made for a continuance and the petitioners announced that they were ready. No objection was then urged that newspaper publicity had produced so hostile an atmosphere or so prevalent a public preconception of guilt as to make the selection of a fair and impartial jury either difficult or impossible. Although I recognize that a defendant "is not obligated to forego his constitutional right to an impartial trial in the district wherein the offense is alleged to have been committed"[6], I feel that the failure of the petitioners to apply for a change of venue has added significance when considered with their omission to make application for an adjournment of the trial. This neglect of the petitioners to avail themselves of long-established remedies supports the conclusion that the publicity of which they now complain was neither so damaging nor widespread in effect as they now urge. The petitioners and their attorneys were no strangers to the great metropolitan district in which the trial took place. It would be ridiculous to hold that if the publicity before trial had been so prejudicial as to inflame and infect the public mind they could have been entirely ignorant of it.[7]

The voir dire examination of the prospective jurors was fully and fairly conducted by the trial judge.[8] The petitioners were granted ten additional peremptory challenges; they did not exercise all of these and informed the court that the jury was satisfactory.[9] This was the considered judgment and decision of the "highly competent and experienced"[10] attorneys who represented the petitioners on the trial.

■ Quite aside from the question of whether this objection may now for the first time be advanced as a ground for a new trial[11] I find no evidence to support the claim that the trial proceeded under conditions which deprived the petitioners of the opportunity for a fair trial before an impartial jury.

In fact, an examination of the chart which petitioners have submitted purporting to analyze "Quantitative Reportage, Feb. 1, 1950 to April 3, 1951" dealing with news items classified in four groupings—"Atomic Espionage", "Communists as Spies", "Atomic Bomb" and Rosenberg-Sobell Case"—sustains this conclusion. I find that from the latter part of August 1950 to November 1950 there was only minor and sporadic coverage and that from November 1950 until February 21, 1950, which was approximately two weeks prior to the commencement of the trial, there were no news items whatsoever concerning the pending prosecution. During the following week from February 21 to 28, 1951, the publicity was negligible, and when the trial proceeded, the

6. Delaney v. U. S., 1 Cir., 1952, 199 F.2d 107, 116.

7. In his reply affidavit submitted on this application, it is stated by counsel for petitioners Rosenberg that the "entire panorama" of pretrial publicity could not have been revealed to him by the "usual sporadic reading of an average newspaper reader in New York City", and that he was "unaware of the total picture." p. 3, aff. of E. Bloch, 12/2/52

8. Record pp. 43–158.

9. The Trial record contains the following: "The Court: You waive your last challenge? Mr. A. Block: That is correct. Mr. Saypol: Challenges waived and the jury is satisfactory to the Government.

The Court: Very well. Mr. Kuntz: Satisfactory to the defendant. The Court: Jury satisfactory all around. Mr. E. H. Block: Satisfactory all around." (R.152).

10. U. S. v. Rosenberg, 2 Cir., 1952, 195 F.2d 583, 593.

11. Smith v. U. S., 88 U.S.App.D.C. 80, 187 F.2d 192, certiorari denied 341 U.S. 927, 71 S.Ct. 792, 95 L.Ed. 1358; U. S. v. Walker, 2 Cir., 1947, 197 F.2d 287; Cf. U.S. ex rel. Marshall v. Snyder, 2 Cir., 1947, 160 F.2d 351.

attendant publicity reveals nothing extraordinary or unusual.

Petitioners next object to publicity which resulted from "press-releases" and "statements" emanating from the office of the United State Attorney and the Department of Justice.

It appears from the exhibits submitted by petitioners that as the trial proceeded there were daily reports in the newspapers of the progress of the trial, the witnesses called and the testimony given. On a few occasions during the trial "statements" were made to the press by those charged in law with conducting the prosecution. It appears further that following the arrest of the petitioners and prior to trial "press-releases" were issued by the prosecuting and law enforcement agencies of the Government.

The issuance of "releases" and "statements" by the quasi-judicial officials entrusted with the heavy burden and grave responsibility of prosecution giving in advance of trial details of evidence which it is expected will be introduced at trial is an all too prevalent practice, which should not be encouraged. It does not aid in the administration of justice and often hampers and impedes complete investigation of the crime, which might be productive of further evidence if not of other crimes. It is opposed to all fundamental concepts of due process and, if carried to an extreme, might result in conviction by public opinion without the benefit of jury. Due process requires compliance not only with the outward form of the law but with "all that is 'implicit in the concept of ordered liberty' " [12] and with the immutable principles of justice. But, even though the "press-releases" and "statements" of public officials may have prompted, encouraged or generated publicity, there is no evidence that these publications resulted in "manifestations of public sentiment, or any other form of disorder, calculated to influence court or jury" [13].

There is no evidence that any juror after being sworn violated the trial judge's instruction and read any newspaper report or article concerning the trial of petitioners. There is no proof to sustain a finding that the judgment of the jurors was in any manner influenced or swayed adversely to the petitioners, either prior to or during the trial. This is not an instance where "the trial was but a legal gesture to register a verdict already dictated by the press and the public opinion which is generated." [14]

The petitioners also claim that the publicity attending the indictment for perjury and the arrest of William Perl, which occurred while the trial was in progress, had the effect of prejudicing the minds of the jurors against the petitioners.

The facts concerning the Perl indictment and arrest are not in dispute. He had been a witness before a Grand Jury in this district; he was indicted by that Grand Jury on March 13, 1951 and when the indictment had been returned it was ordered sealed. Late the following day the indictment was unsealed upon application to the judge presiding at petitioners' trial; the application was made to him because the judge then assigned to that duty was not available. Perl was then arrested and arraigned on March 15, 1951, not before the trial judge, but in the part where such arraignments are held. There was nothing unusual in the procedure followed. The indictment against Perl charged perjury before the Grand Jury; it contained four counts: the first count was with respect to his testimony concerning the petitioner Sobell; the second count contained charges with respect to his testimony concerning Helene Elitcher, the wife of Max Elitcher who had appeared as a Government witness on the trial of the petitioners before the return of the Perl

12. Wolf v. People of State of Colorado, 1949, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782; citing Palko v. State of Connecticut, 1937, 302 U.S. 319, 58 S. Ct. 149, 82 L.Ed. 288.

13. Frank v. Mangum, 1915, 237 U.S. 309, 35 S.Ct. 582, 591, 59 L.Ed. 969, 984.

14. Shepherd v. State of Florida, 1951, 341 U.S. 50, 51, 71 S.Ct. 549, 95 L.Ed. 740.

indictment; the third count concerned his testimony as to his knowledge of the petitioner Julius Rosenberg; and the fourth count concerned his testimony as to his knowledge of Ann and Michael Sidorovich, who had been listed as prospective Government witnesses on the trial of petitioners. The allegedly false testimony upon which counts one, two and three of the indictment were based, it is charged, was given before the Grand Jury on August 18, 1950; the fourth count was predicated upon testimony given by Perl on September 11, 1950.

▮▮ The petitioners argue that the filing of the indictment and the arrest of Perl were deliberately scheduled so as to provide an occasion during the trial for publicity unfavorable to the petitioners. They ask that this inference be drawn from the foregoing facts and from the circumstance that Perl has not yet been brought to trial on this indictment.

By affidavit, the United States Attorney now reveals that it was not until March 6, 1951 that he came into possession of evidence sufficient in law to sustain Perl's indictment for perjury. This satisfactorily explains why Perl was not indicted until March 13, 1951 for perjury alleged to have been committed on August 18, 1950 and on September 11, 1950. The United States Attorney further states that the Perl indictment has not yet been brought to trial because of a purpose on his part to prevent disclosures which would interfere with other prosecutions. I may not on this hearing pry into the reasons which prompted the prosecutor to adjourn the trial of the Perl indictment. I accept the explanation given; certainly the delay does not warrant drawing the inference which petitioners press.

Again as to this indictment of Perl, there is not the slightest proof that any of the trial jurors read of the arrest or indictment of Perl or that it came to their attention in any manner.

▮ A defendant may not demand that the machinery of law enforcement be stopped while his trial proceeds, or that the prosecution of others, who, as he, are charged with violating the law, be held in abeyance until his trial has been completed. If an incident occurs during his trial arising either from the prosecution of another or from any other cause which acts to his prejudice, the law provides that steps be taken by the defendant. The matter should first be called to the attention of the trial judge with a request for appropriate action. The judge is not "confined within mechanical rules" but has authority to exercise wide discretion to correct any situation harmful to a defendant.[15] The trial judge upon proper application by the petitioners might have "caution(ed) the jury not to be influenced by anything seen in the newspapers or to declare a mistrial."[16] The petitioners did bring the matter of Perl's indictment before the trial judge but they elected not to move for a mistrial; they may not now object.

The petitioners also urge that the United States Attorney "knowingly used false testimony" on the trial. Three specifications are made in support of this claim: (1) that the witness David Greenglass, called by the Government, testified falsely concerning his cooperation with the law enforcement agencies; (2) that the same Greenglass testified falsely concerning the preparations he had made to equip himself to testify relating to the subject matter and the information unlawfully transferred by him; and (3) that the Government witness Ben Schneider falsely testified that up to his appearance as a witness he had not seen the petitioner Julius Rosenberg since his visit to Schneider's photography store to have passport photographs taken. I shall consider each specification of this claim—

1. Greenglass testified that he had been arrested on June 15, 1950 (R.567) by four agents of the Federal Bureau of Investigation, who had come to his home at about 2 P.M. on that day; that the agents had remained with him in his home until 7 or 7:30 p.m.; that once in a while one of them questioned him; that he was then taken down to the office of the Federal Bureau of In-

15. Cf. Nardone v. U. S., 1939, 308 U.S. 338, 342, 60 S.Ct. 266, 84 L.Ed. 307.

16. U. S. v. Weber, 2 Cir., 1952, 197 F.2d 237, 239.

vestigation where he later stated that he would make a statement; that a stenographer was brought in and that his statement was stenographically recorded (R.575). When he was pressed on the trial as to the exact time when he had said he would make the statement, Greenglass testified: "You can't pinpoint me on when I said I was going to give a statement, because I don't remember those things." (R.575). Questioned further on the subject he added that he hadn't "read that statement since and I certainly don't know exactly what I put in it" (R.577), but he added that he hadn't "conscientiously" withheld any facts that night and that the statement he had then made was substantially the same as his testimony on the trial. (R.577).

At no time did petitioners' attorneys call for the production of the statement, or ask the trial judge to examine it for the purpose of determining whether it did in fact contain statements contradictory to the testimony he had given on the trial. No request was made for a direction that the statement be delivered to petitioners' attorneys for use on their extensive and searching cross-examination of Greenglass (R.537 to 676).

■ It is now argued that Greenglass falsely testified concerning his disclosures on the night of his arrest and that he did not in fact make full disclosure as to his activities until a later date. This argument the petitioners predicate upon a statement by the United States Attorney made when Greenglass appeared for sentence on April 6, 1951 (R.1623). When this is read in context with all the proceedings had that morning, and particularly the statement of Greenglass' attorney that Greenglass "did cooperate with the Government and almost from the outset" (R.1628), we do not take it as an admission unwittingly made that Greenglass had committed perjury. I do not have to consider the affidavits of Special Agents Lewis and Frutkin to arrive at a finding that there is no factual basis for inferring that Greenglass' testimony was perjurious or "that it was knowingly, wilfully and intentionally used"[17].

Full opportunity during trial was available to petitioners' attorneys to demand at least a preliminary examination of Greenglass' statement; no such application was made. I do not feel called upon to now examine the statement on the flimsy showing made.

2. The second objection centers around Government's Exhibits 2, 6, 7 and 8, which were introduced in evidence during and on the basis of the Greenglass testimony.

Exhibit 2—according to Greenglass—was a copy of a sketch of the lens mold which Greenglass testified he had delivered to Julius Rosenberg in January 1945 (R.439–40). He had prepared this copy of the sketch during the trial (R.440).

Exhibit 6—according to Greenglass—was his recollection of the sketch of the face view of the flat type lens mold which he had given to Gold in June, 1945 (R.460, 461).

Exhibit 7—Greenglass testified—was his recollection of a sketch of a schematic view of the lens mold shown on Exhibit 6 being used on experiment (R.462), which he also gave to Gold in June, 1945.

Exhibit 8—Greenglass testified—represented his recollection of a sketch of a cross-section of the atom bomb, which he gave to Rosenberg in September, 1945. (R.498).

Greenglass testified that "high explosive lens molds" were made in his shop (R.495); that the one from which he had acquired his knowledge was of a different type from that used at Hiroshima, and was a type that worked on an "implosion effect" and which had been manufactured at Los Alamos. (R.495). Greenglass also testified that when he had given Gold the sketches of which Exhibits 6 and 7 were replicas, he also "gave some scientists' names" and "some possible recruits for espionage" (R.497). He testified that it all took up about 12 pages of written material including the sketch of the cross-section of the atom bomb.

On cross-examination, Greenglass testified that when drawing Exhibits 2, 6 and 7 he had relied solely on his memory of in-

17. Ryles v. U. S., 10 Cir., 1952, 198 F.2d 199, 200.

formation he had acquired while working at the Los Alamos project, and that he had last worked there in February, 1946,—four and one-half years before he testified (R.461, 463, 609); and, that since his arrest and during his confinement in jail he had not been given any reference work, texts or scientific books. (R.610). He further testified that he had not received help from anybody in the preparation or drawing of these exhibits.

Exhibit 8 was impounded by the trial judge after being introduced in evidence.

Petitioners now submit affidavits from three individuals, represented as experts in the field of physics, who express the opinion that it is "improbable" that Greenglass could have reproduced the sketches from memory. A fourth affidavit from a scientific writer or correspondent for a newspaper records his opinion as to the "impossibility" of Greenglass' being able to make these sketches from memory. It is upon these "opinions" that petitioners would have me find that Greenglass gave perjurious testimony concerning the circumstances surrounding the drawing by him of these exhibits. None of these four affiants could possibly have seen Exhibit 8, which had been impounded.

■■■ There may be some rare instances when a trial judge permits testimony by medical experts as to the competence or probity of a witness when appraised solely on his mental ability to testify truthfully, —that is, whether the witness is a pathological liar or mentally incapable of telling the truth. But it is hornbook law that the credibility of a witness and the weight to be given his testimony rests exclusively with the jury. Opinion evidence when offered by one who has neither observed the witness while he testifies nor ever seen him is inadmissible on any trial and may not be considered by me as the basis for a conclusion that perjury was committed.

■■■ 3. The next objection as to the knowing use of perjurious testimony concerns the witness Ben Schneider, who was called in rebuttal by the Government.

Schneider testified that he was a photographer and that he had a store at 99 Park Row, where his main business was taking photographs for passport and identification purposes; that in May or June, 1950 the petitioners Rosenberg and two children visited his shop and ordered and paid for three dozen photographs, passport-size, for which he was paid $9.; that Julius Rosenberg at the time told him that he was going to France; that some property had been left his wife and that they were going to take care of it. (R.1428–29). Schneider further testified that he had first been told he would be a witness at about 11:30 A.M. on the day before he testified when he had been visited by some agents of the Federal Bureau of Investigation (R.1425).

Just prior to the close of his direct examination, Schneider was asked, with reference to the last time he had seen Julius Rosenberg, the following question to which he made the following response:

"Q. And is that the last time you saw him before today? A. That's right."

It is not disputed that on the day prior to Schneider's testimony he had been brought into the trial courtroom for the purpose of seeing whether he could identify Rosenberg as the person whose photograph he had taken. There was no motive for falsehood on the part of Schneider and there is not the slightest evidence that Schneider's testimony on this was intentionally false. I hold it to be on an immaterial point because the petitioners Rosenberg did not deny on cross-examination prior to Schneider's appearance as a witness that they had been in Schneider's store. Thus, Julius Rosenberg was questioned:

"Q. Did you go to a photographer's shop at 99 Park Row and have any photos taken? A. I have been in many photographers' shops and had photos taken.

"Q. Did you have any taken in May or June of 1950? A. I don't recall. I might have had some photos taken.

* * * * * *

"Q. Now, do you recall, or are you sure now that you didn't have any passport pictures taken in 99 Park Row, in May or June 1950? A. I

may have taken pictures, not—I didn't take any passport pictures.

"Q. May or June 1950? A. I might have taken pictures.

"Q. For what purpose have you taken pictures in May or June 1950? A. I have already answered that.

"Q. May we have an answer? A. Just taken pictures" (R.1278–79).

The testimony of petitioner Ethel Rosenberg at no point shows a categorical denial that she and her family had gone to the photographer's shop at 99 Park Row in May or June 1950.

The vital portion of Schneider's testimony was his recollection of what Julius Rosenberg had told him; on that a sharp issue was raised and it appears from the verdict to have been resolved by the jury adversely to the petitioners. The challenge now made to Schneider's testimony does not stamp him as a perjurer.

Petitioners also urge that their conviction should be set aside because the evidence failed to show that all the information which they conspired to transmit was of such a character as could properly be classified secret.

To establish need for the secrecy of some of the information unlawfully transmitted, the Government called a physical chemist who had been employed as an engineer at the Los Alamos Scientific Laboratories from 1944 through part of 1947. He testified that the work "was associated with implosion research connected with the atomic bomb." (R.470). He identified Exhibit 2 as a reasonably accurate portrayal of a type of lens used at Los Alamos. (R.473). He gave similar testimony as to Exhibit 6 (R.474). He identified Exhibit 7 as a rough sketch of an experimental set-up (R.477), and testified that Greenglass in his employment had access to the information shown on these exhibits. (R.479). He testified that information relating to the lens mold, the lens and the experimentation had been classified as secret. (R.478–9). He gave his expert opinion that of the experimentation "there was no information in text books or technical journals on this subject" (R.478), and

that it concerned "a new and original field." (R.478). Just before this witness left the stand the court inquired of him—

"Q. While there might have been some other details that might also have been of some use to a foreign nation which were not contained on Exhibits 2, 6 and 7, the substance of your testimony is that there was sufficient on Exhibits 2, 6 and 7 to reveal to an expert which was going on at Los Alamos? A. Yes, your Honor." (R. 485–6).

The Government also called another engineer who was familiar with the work at Los Alamos. He testified that the sketch—Government's Exhibit 8—when considered with the material Greenglass testified he had disclosed, demonstrated "substantially and with substantial accuracy the principle involved in the operation of the 1945 atomic bomb" (R.910) and that it was classified as top secret (R.911).

Although petitioners were found guilty of conspiring to transmit many items of classified information, their present attack on such classification as "arbitrary and capricious" is directed to but one item—information relative to the use of the lens in the atomic bomb.

They contend that there was nothing informative or new about the details of the high-explosive lens used in atomic weapons, that the theory underlying the use of the lens and implosion has been known for many years. They have listed the names and authors of various treatises and texts in the field of nuclear physics, and from this would have me conclude that the experimentation in the use of the atomic bomb which was disclosed was a matter of public knowledge.

 Assuming that what they say is so—that the theory of atomic energy in the explosives field was known or contemplated years ago by scientists and physicists—it does not follow that the practicability and feasability of applying this theory to the manufacture of modern war implements was common knowledge to any other country. Certainly, we cannot say that in the United States this information has been made public, nor can we assume that it "has

thus become available in one way or another to any foreign government"[18]. Petitioners offer no evidence to support their contention that the classification of this information was arbitrary, or that the United States Government had information which would have led it to believe it was well-known.

The claim now made by petitioners, cannot be said to constitute newly-discovered evidence. The very basis of their argument that prior knowledge of this use of atomic energy is revealed by the recorded experiments and treatises of numerous physicists was evidence available to them during the trial and an issue which could have been presented then and considered by the jury in its determination of the nature of the information which petitioners conspired to transmit.[19]

This issue of fact was presented to the jury by the trial judge (R.1554); it was resolved against the petitioners; it may not be retried on this application.

An additional ground for relief is urged by petitioner Sobell under the Treason Clause of the Constitution, Art. 3, Sec. 3, Cl. 1, which provides in part that "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court."

It is argued that this clause was violated by the admission of evidence of a "general intent to betray", unsupported by the testimony of two witnesses; that such testimony was erroneously admitted to prove the specific criminal intent to give secret information required by the Espionage Act; and that absent a prior showing of specific criminal intent, evidence of a general treasonous intent can under the Treason Clause only be established by the testimony of two witnesses.

At trial there was testimony offered and received over objection by petitioner's attorney (R.198, 205) that Sobell had been a member of the Communist Party in 1939–1941. At one point in a long discussion con-

cerning the admissibility of this evidence, the trial judge inquired of the United States Attorney the theory on which it was offered, and the following colloquy ensued:

"The Court—On what theory are you offering it? To prove the offense in the indictment?

"Mr. Saypol—Oh, indeed not; to prove association, to prove intent, to prove motive for the crime which will be proved.

"The Court—Very well. I will overrule the objection." (R.199).

Later the trial judge said that he was admitting the evidence "purely on the question of motive and not as proving the charge" (R.200); still later the trial judge observed "you have to have intent; you have to have criminal intent," at which point Sobell's attorney remarked "this statute, every word of it, the statute reads with intent, or reason to believe." (R.201).

The objection interposed to the reception of this testimony was couched in terms that it was "incompetent, irrelevant and immaterial to the issues in this case and can only inject an extraneous issue that will confuse the jury and prejudice the defendants." (R.199). At no time was objection made that the reception of this testimony in the prosecution of an indictment returned for violation of Section 34, Title 50 U.S.C.A., would in effect resolve the charges in the indictment to allege Treason instead of Espionage, or result in denial to the petitioners of the constitutional guarantee that "the Testimony of two Witnesses to the same overt Act" be required to sustain a conviction of Treason against the United States. No mention was made by the petitioners of Cramer v. United States, 1944, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441, as being the basis upon which the objections were made.

The trial judge specifically instructed the jury that this testimony was to be considered "solely on the question of the defendants' intent or reason to believe that the alleged secret information to be transmit-

18. U. S. v. Heine, 2 Cir., 1945, 151 F.2d 813, 817.

19. Gorin v. U. S., 1941, 312 U.S. 19, 31– 32, 61 S.Ct. 429, 85 L.Ed. 488, rehearing denied 312 U.S. 713, 61 S.Ct. 617, 85 L. Ed. 1144.

ted would be used to the advantage of a foreign nation".[20]

▮ The Espionage Act of 1917 "makes criminal * * * the communication of the prohibited information to the advantage of 'any foreign nation,' even if such communication does not injure this country."[21] The specific intent required by the Statute to be proved as an element of the crime requires not a purpose to "betray" the United States, but to aid a foreign power regardless of injury to the United States.[22] The Court of Appeals so held and doing so approved the instructions of the trial judge.

All of the petitioners on their appeal to the Court of Appeals questioned the admissibility of this testimony, but they did so on the same general objections made during the trial. None, then, presented the constitutional objection now urged, nor was it raised in their applications to the Court of Appeals for re-hearing. The Court of Appeals held that this testimony was properly admitted.[23] The petitioners Rosenberg in their petitions to the Supreme Court for certiorari urged the admission of this testimony to be error and cited "Cramer", supra. The petitioner Sobell also relied upon a claim of error in the admission of this testimony and on his petition to the Supreme Court for re-hearing specifically presented the constitutional objection now raised.

20. In his charge the trial judge said:
"Now I wish to instruct you at this point that I have admitted testimony as to membership or activity in the Communist Party and also testimony to the effect that the Communist Party is dedicated to furthering the interests of the Union of Soviet Socialist Republics solely on the question of the defendants' intent or reason to believe that the alleged secret information to be transmitted would be used to the advantage of a foreign nation, in this case the Union of Soviet Socialist Republics, which is an element of the charge that the Government must prove beyond a reasonable doubt.
I wish to caution you most strenuously that proof of Communist Party membership or activity does not prove the offense charged in this indictment, but may be considered by you solely on the question of intent which is one element of the crime charged here." R. 1558).

Ample opportunity was afforded the petitioners to raise the objection now urged as to the admissibility of this testimony at trial and again in the Court of Appeals. But, it is not necessary to hold that it may not now be made because of the limited power we have under Section 2255 [24], for I conclude that this objection is without merit.

The petitions are denied; the files and records of this case and the papers and exhibits now submitted conclusively show that the petitioners are entitled to no relief.[25] Since I find no substantial question of law raised by these proceedings, the application made on behalf of the petitioners Rosenberg for a stay of execution of the judgment pronounced against them is denied.

### Appendix

The following is a list of the points which have heretofore been raised by the petitioners.

By the petitioners, Rosenberg.

In the Court of Appeals:

1. Constitutionality of Espionage Statute.
 a. Statute is vague and indefinite.
 b. Intent provisions are vague and indefinite.
 c. Statute does not establish a sufficiently certain standard of guilt.
2. Sufficiency of indictment.

21. U. S. v. Rosenberg, supra, 195 F.2d at page 590.

22. Id.

23. On the importance of this and similar testimony to the establishment of the Government's case, the Court of Appeals wrote, "If the jury believed her (Miss Bentley), she supplied the missing link connecting the Communist Party with the Soviet Union, and making Communist Party membership probative of motive or intent to aid Russia." U. S. v. Rosenberg, supra, 195 F.2d at pages 595–596.

24. Cf. U. S. v. Walker, supra; Smith v. U. S., supra; U. S. v. Snyder, supra.

25. U. S. v. Hayman, 1952, 342 U.S. 205, 72 S.Ct. 263.

3. Conduct of Trial Judge as a deprivation of a fair trial.
4. Prejudicial Instructions to Jury.
 a. Special need to enforce law.
 b. Distortion of defense theory.
 c. Refusal to read cross-examination to jury.
5. Errors in reception of evidence.
 a. Communist belief and affiliation as evidence of motive and intent.
 b. Bentley-Julius telephone calls.
 c. Theft by Rosenberg of proximity fuse.
 d. Use of sketches of lens and atom bomb.
 e. Receipt of Schneider testimony.
6. Sentence of death constituted cruel and unusual punishment.

In the Court of Appeals on Petition for Rehearing:
1. The conviction violated the Treason Clause in the Constitution.
2. The capital punishment portion of the Espionage Statute is unconstitutional.

In the Supreme Court on Petition for Writ of Certiorari:
1. Constitutionality of Espionage Act under First and Fifth Amendments.
2. Sufficiency of indictment under Sixth Amendment.
3. Whether convictions rest on evasion of treason clause.
4. Whether conduct of Trial Judge deprived defendants of fair trial.
 a. Bias of judge.
 b. Improper instructions.
 c. Distortion of evidence.
5. Improper receipt of evidence.
 a. Communist evidence relating to Defendants' Intent.
 b. Bentley-Julius telephone calls.
 c. Schneider testimony.
6. The sentence of death as cruel and unusual punishment.

In the Supreme Court on Petition for Rehearing:
1. Espionage Act as construed violates Treason Clause of Constitution.

2. Espionage Act as construed rendered criminal offenses "of the same kind as treason", but not treason.
3. Proof of criminal intent by imputation from Communist Affiliation was Improper.
4. Sentences were based on improper factual basis.
5. Sentences were excessive.

By the petitioner, Sobell.

In the Court of Appeals:
1. Insufficiency of evidence.
2. Testimony showed two conspiracies.
3. Insufficiency of indictment.
4. Errors in reception of evidence or misconduct depriving defendant of fair trial.
 a. The Communist Issue as evidence of motive or intent.
 b. Evidence establishing Sobell had been deported from Mexico.
 c. Conduct of Court (relying on issue as raised by Rosenbergs).
 d. Conduct of prosecutor.
5. Court had no jurisdiction over person of Sobell because he was forcibly seized in a foreign county.

In the Court of Appeals on Petition for Rehearing:
1. Double conspiracy argument.
2. Error in receipt of evidence of political views on issue of intent.
3. Denial of Fuller Bill of Particulars was error.

In the Supreme Court on Petition for Writ of Certiorari:
1. Double conspiracy argument.
2. Whether Sobell was denied a fair trial.
 a. References to "treason".
 b. Testimony relating to Communist Party membership and activity.
 c. Conduct of trial judge and prosecutor.
 d. Evidence of flight to Mexico.
 e. Evidence that defendant was deported from Mexico.
3. Sufficiency of evidence.

4. Evasion of Treason Clause of Constitution.
5. Constitutionality of statute and sufficiency of indictment.
6. Alleged kidnapping of defendant.

In the Supreme Court on Petition for Rehearing:

1. Construction of Espionage Act conflicted with Treason Clause of Constitution.
2. Proof of Communist Party membership did not prove requisite intent.
3. Sentence was arbitrary and appellate courts should modify it.